PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

ANDREA SMITH; GREGORY WELSH;
LARRY HORNSTEIN,
Petitioners-Appellees,

v.                                                          No. 97-2192

JAMES CROMER,
Respondent-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, District Judge.
(CA-97-1623-WMN)

Argued: January 29, 1998

Decided: October 22, 1998

Before WILKINSON, Chief Judge, PHILLIPS, Senior Circuit Judge,
and VOORHEES, United States District Judge for the
Western District of North Carolina, sitting by designation.

_____

Affirmed by published opinion. Judge Voorhees wrote the majority
opinion, in which Chief Judge Wilkinson joined. Senior Judge Phil-
lips wrote a dissenting opinion.

_____

COUNSEL

ARGUED: Nancy Susanne Forster, OFFICE OF THE PUBLIC
DEFENDER, Baltimore, Maryland, for Appellant. Albert David Cop-
perthite, Assistant United States Attorney, Baltimore, Maryland, for

Appellees. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellees.

_____

## OPINION

VOORHEES, District Judge:

In this case, employees of the United States Department of Justice were subpoenaed to testify in a state criminal prosecution in direct contravention of DOJ regulations. Appellant Cromer, the defendant in the state case, subpoenaed appellees, Assistant United States Attorneys ("AUSA's") Smith and Welsh and Drug Enforcement Administration Agent Hornstein. His purpose was to compel their testimony at trial and to compel production by the Government of his Confidential Informant file in order to facilitate preparation of his defense to state narcotics charges. The Government removed the case from Maryland state court to federal district court pursuant to 28 U.S.C. § 1442(a)(1). The district court granted the Government's motion to institute a protective order and to quash subpoenas. Cromer filed the instant appeal, seeking reversal of the district court's order. We affirm the order of the district court.

I.

Appellees Andrea Smith and Gregory Welsh are Assistant United States Attorneys for the District of Maryland, and Appellee Larry Hornstein is a special Agent with the Drug Enforcement Administration. Appellees (hereinafter, the "Government") are employees of the Department of Justice and are subject to rules and regulations promulgated by the Department of Justice regarding the release of documents and provision of testimony in court actions. 28 C.F.R. §§ 16.21 et seq. Appellant Cromer (hereinafter, "Cromer") served as a DEA confidential informant ("CI") from June 1994 through November 1995, until he was indicted on two charges of delivering heroin to a state informant in November 1995.

In preparation for his criminal trial, Cromer subpoenaed Smith, Welsh, and Hornstein for their testimony at trial and also served sub-

2

poenas duces tecum for certain documents, i.e. , "any and all letters, memorandums, and notes written in reference to or on behalf of ... [Cromer] ... to any judge, probation officer, parole commission, attorney or pretrial detention service division in the federal and/or state system" (to Smith and Welsh), and the entire contents of his Cooperating Individual File (to Agent Hornstein).

The state court judge, Circuit Court Judge Thomas Waxter, Jr., performed an in camera review of Cromer's Cooperating Individual File, and, finding the information contained therein to be discoverable pursuant to Zaal v. Maryland, 326 Md. 54 (1992), ordered the Government to produce the file to Cromer's defense attorney. In response, the Government removed the matter to federal district court, moved for a protective order and moved to quash the subpoenas.

Following a hearing, District Judge William M. Nickerson analyzed the competing interests of the parties and weighed Cromer's due process rights to the evidence he sought against the Government's prerogative to resist having its employees subpoenaed to testify in state court. The district court found that Cromer had raised an insufficient basis to compel the Government to disclose confidential information and that Cromer had alternative access to the information he sought. For those reasons, and "in light of the policies underlying sovereign immunity," the district court granted the Government's motion for protective order and motion to quash the subpoenas.

II.

The issue on appeal is whether the doctrine of sovereign immunity divests the district court of jurisdiction to enforce the subpoenas. We agree with the district court that it does.

The Government moved to quash the subpoenas on the basis of Justice Department regulations promulgated under the authority of the "Housekeeping Statute," 5 U.S.C. § 301, which provides:

> The head of an Executive department ... may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its busi-

3

ness, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

Regulations applicable to the production and disclosure of information by the Justice Department in federal and state proceedings are found at 28 C.F.R. §§ 16.21, et seq. Section 16.22(a) provides:

> In any federal or state case or matter in which the United States is not a party, no employee ... of the Department of Justice shall, in response to a demand, produce any material contained in the files of the Department, or disclose any information relating to or based upon material contained in the files of the Department, or disclose any information or produce any material acquired as part of the performance of that person's official duties or because of that person's official status without prior approval of the proper Department official ....

The Department of Justice regulations at issue here clearly fall within the terms of the first sentence of the Housekeeping Statute. That regulation prescribes the conduct of employees, the performance of the agency's business, and the use of its records. In re Boeh, 25 F.3d 761 (9th Cir. 1994). Any doubt as to the validity of the regulation's requirement of prior approval is foreclosed by the Supreme Court's decision in United States ex rel. Touhy v. Ragen , 340 U.S. 462, 468 (1951), which upheld the validity of a predecessor to 28 C.F.R. § 16.22(a). Id. Appellees may not be forced to comply with the subpoenas if a valid regulation required them not to comply. Ex Parte Sackett, 74 F.2d 922, 923 (9th Cir. 1935); Boron Oil Co. v. Downie, 873 F.2d 67, 69 (4th Cir. 1989). We are convinced, both by statute and precedent, that 28 C.F.R. § 16.22(a) is valid insofar as it directs Appellees not to testify without prior approval of the proper Department official.

In determining whether to provide information in response to a demand, such as the subpoenas in the instant case, the Justice Department considers, among other things, whether disclosure would reveal a confidential source, reveal investigative records compiled for law

4

enforcement purposes, disclose investigative techniques, or interfere with enforcement proceedings. 28 C.F.R. § 16.26(b)(4) and (5). If so, disclosure is forbidden under the regulations, unless the Justice Department determines that the "administration of justice requires disclosure." 28 C.F.R. § 16.26(c). The interests to be protected present a strong policy basis supporting the Justice Department's determination not to reveal its own information which it considers to be critical to the effective operation of the agency.

The instant appeal originated as a motion to quash subpoenas issued in a state court action and removed to federal district court under 28 U.S.C. §1442. In Boron Oil Co. v. Downie, 873 F.2d 67 (4th Cir. 1989), a private litigant filed a civil action in state court, and sought the testimony of Downie, an EPA employee, regarding information Downie had obtained while investigating a gas leak. Initially, Downie agreed to testify. However, the EPA district counsel later determined that Downie would not be allowed to testify. This determination was based upon an EPA regulation, which provides, among other things, that requests for employees' testimony and production of documents will be approved "... when clearly in the interests of the EPA." 40 C.F.R. § 2.401.

The district court conducted a hearing, and enforced the subpoenas based upon findings that the information sought was not privileged, that Downie was in the best position to provide the information "which was essential to the fair administration of justice in the civil action," and that the interference and inconvenience to the EPA would be minimal. Boron Oil Co. v. Downie, 873 F.2d at 68. The district court rejected the defense of sovereign immunity because neither the United States nor the EPA were named parties. This court reversed, holding that a state court, and federal court on removal, lacked jurisdiction to compel a federal employee to testify concerning information acquired during the course of his official duties, in a state court civil action to which the United States was not a party. Boron Oil Co. v. Downie, 873 F.2d at 69-71.

It is clear that a federal court's jurisdiction upon removal under 28 U.S.C. § 1442(a)(1) is derivative of the state court jurisdiction, and where the state court lacks jurisdiction over the subject matter or the parties, the federal court acquires none upon removal, even though in

5

a like suit originally brought in federal court, the court would have had jurisdiction. <u>Boron</u>, 873 F.2d at 70. It is also clear that an action seeking specific relief against a federal official, acting within the scope of his delegated authority, is an action against the United States, subject to the governmental privilege of sovereign immunity. <u>Boron</u>, 873 F.2d at 69. Where an agency has not waived its immunity to suit, the state court (and the federal court on removal) lacks jurisdiction to proceed against a federal employee acting pursuant to agency direction. <u>Id.</u>

In reversing the district court in <u>Boron</u>, this court reasoned that "<u>Touhy</u> [<u>v. Ragen</u>, 340 U.S. 462 (1951),] is part of an unbroken line of authority which directly supports Downie's contention that a federal employee may not be compelled to testify contrary to his federal employer's instructions under valid agency regulations." In <u>Touhy</u>, the Supreme Court had held that subordinate federal officers could not be held in contempt for failing to comply with a court order in reliance on a validly promulgated regulation to the contrary. Further, we noted in <u>Boron</u> that the doctrine of sovereign immunity precluded the state court--and the federal court on removal--from exercising jurisdiction to compel Downie to testify contrary to EPA instructions, and also denied it the authority to review and set aside the EPA's decision and the federal regulations under which it is made. <u>Boron</u>, 873 F.2d at 70. For a state court (or federal court exercising removal jurisdiction) to assert the power of judicial review over decisions made by federal agencies while implementing their own regulations is contrary to the Administrative Procedures Act, 5 U.S.C. § 702, which expressly limits such review authority to the federal courts. <u>Boron</u>, 873 F.2d at 71.

Other circuits which have addressed this issue likewise deny state court access to federal agency records based upon the doctrine of sovereign immunity. <u>See</u>, <u>e.g.</u>, <u>In re Elko County Grand Jury</u>, 109 F.3d 554 (9th Cir. 1997) (state court lacked jurisdiction to compel a forest service employee to appear and testify before grand jury in contravention of USDA regulations); <u>Houston Bus. Journal, Inc. v. Office of the Comptroller of the Currency</u>, 86 F.3d 1208 (D.C. Cir. 1996) (state court, and federal court on removal, lacked jurisdiction to compel production of records from comptroller general when production was in violation of agency regulations); <u>Edwards v. United States Dept. Of</u>

6

Justice, 43 F.3d 312 (7th Cir. 1994) (state court had no authority to compel discovery of FBI surveillance tapes after Justice Department denied production pursuant to 28 C.F.R. § 16.26(b)(5)); In re Boeh, 25 F.3d 761 (9th Cir. 1994) (FBI agent cannot be held in contempt for refusing to testify absent permission of the Justice Department, pursuant to 28 C.F.R. § 16.22(a)); Louisiana v. Sparks, 978 F.2d 226 (5th Cir. 1992) (state court subpoena issued to federal parole officer quashed on sovereign immunity grounds). These decisions, like our decision in Boron v. Downie, reflect the principle of federal supremacy in two ways: (1) by applying the doctrine of sovereign immunity to preclude state courts, or a federal court on removal, from reviewing federal agency action, and (2) by giving recognition to the principle that valid federal regulations have the force and effect of federal law, which state courts are bound to follow. Boron , 873 F.2d at 71.

The dissenting opinion argues that sovereign immunity protects a federal official only if he is not "acting unconstitutionally or in excess of his legal authority." Post, at 14. Thus, concludes the dissenting opinion, if Cromer has a constitutional right of access to the information he seeks, then the subpoenaed Justice Department employees act unconstitutionally by refusing to comply with the subpoenas and sovereign immunity is unavailable.

The dissenting opinion is correct in identifying the principle that sovereign immunity is unavailable when "the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional." Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 690 (1949). The error is in believing that it has any application in this case. In Touhy , the Supreme Court upheld as constitutionally valid the predecessor to the current Justice Department regulations which plainly preclude Smith, Welsh, and Hornstein from disclosing the requested records. 340 U.S. at 468-69. The Supreme Court also held in Touhy that pursuant to such regulations, which wisely centralize disclosure decisions in superior Justice Department officials, subordinate employees "may lawfully decline to produce [records] in response to a subpoena duces tecum." Id. at 467 (first emphasis added). The only officials before our court are Smith, Welsh, and Hornstein--subordinate employees of the Justice Department. Under Touhy, their refusal to comply with Cromer's subpoenas pursuant to their superiors' orders simply cannot be termed unconsti-

7

tutional. Accordingly, these subpoena proceedings against Smith, Welsh, and Hornstein are precluded by sovereign immunity.

Cromer argues that the Government has waived sovereign immunity by engaging in partial disclosure of the information he seeks. Specifically, AUSA Smith wrote a letter to the Maryland Parole Commission which revealed that Cromer was working as a CI for the federal government; AUSA Welsh and Agent Hornstein testified on behalf of the state at Cromer's bail hearing. Agent Hornstein provided the CI file to the state court judge for in camera review. However, disclosure of factual information does not effect a waiver of sovereign immunity as to other related matters. See Swett v. Schenk, 792 F.2d 1447, 1452 (9th Cir. 1986) (Permitting a federal employee to testify on certain matters which are not violative of the regulations at issue cannot be construed as an intent to waive immunity.). Cromer's argument is without merit.

It is also incorrect to conclude that the Justice Department regulations, if properly "complied" with, confer some entitlement on parties seeking the disclosure of agency records. The regulations do not purport to grant any right of access to applicants. As 28 C.F.R. § 16.21(d) makes clear, the regulations are "intended only to provide guidance for the internal operations of the Department of Justice, and [are] not intended to, and [do] not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States."

Section 16.22(a), which governs proceedings in which the United States is not a party, prohibits disclosure by subordinate employees "without prior approval of the proper Department official." Sections 16.24 and 16.25 establish the exact manner in which disclosure decisions must be made, including who must be involved and what factors must be considered. If the proper official determines that disclosure should not be permitted, the subordinate employee to whom the request has been made is forbidden to disclose the material. See id. § 16.28 ("[T]he employee or former employee upon whom the demand has been made shall, if so directed by the responsible Department official, respectfully decline to comply with the demand. See United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951)."). Issuing a subpoena to a subordinate employee, as Cromer did, merely sets this

8

process in motion. We reject Cromer's argument that these regulations provide him any additional substantive entitlement.[1]

Based upon the Touhy doctrine and principles of sovereign immunity, we conclude that the state court had no authority to enforce the subpoenas, and the district court acquired none on removal. Cromer's remedy, if any, for the Justice Department's actions in the instant case may be found in the Administrative Procedures Act, 5 U.S.C. § 702, which expressly limits such review authority to the federal courts. Boron, 873 F.2d at 71.

III.

Cromer, however, contends that Boron is distinguishable from the instant case in that the underlying cause here is a criminal one, not civil, and that his constitutional rights to due process and confrontation of witnesses should predominate over the doctrine of sovereign immunity. This is an issue we need not decide, however, because we find that even if some federal official were amenable to state process, and the Roviaro analysis undertaken by the district court below were therefore the correct one, the order of the district court would have to be affirmed.

_____

[1] The dissent states that this procedure is "more elaborate and complicated" than its predecessor. Post, at 27-28. The Department's ultimate disclosure authority, however, still resides in a small number of high-level officials. Compare 28 C.F.R. § 16.25(c) (Deputy or Associate Attorney General) and id. § 16.24(g) (Attorney General) with Department of Justice Order No. 3229 (May 2, 1946) ("the Attorney General, The Assistant to the Attorney General, or an Assistant Attorney General acting for him") (quoted in Touhy, 340 U.S. at 463 n.1). Under the current procedure, it remains safe to "assume ... that the Attorney General can be reached by legal process." Touhy, 340 U.S. at 472 (Frankfurter, J., concurring).

In fact, whatever complexity the dissent discerns in the current regulation results from the Department's effort to vest limited disclosure authority in local United States Attorneys. See 28 C.F.R. §§ 16.23-16.24. This devolution of power should actually increase public access, at least to less sensitive information. It would be perverse to reward this effort by eliminating all means of central control.

9

Relying on the Supreme Court's reasoning in Pennsylvania v. Ritchie, 489 U.S. 39, 60-61 (1987), the district court below determined that as a matter of equity Cromer's due process rights should be balanced against the government's right to protect its employees subpoenaed to testify in state court. (JA 94-95).

The district court relied upon Florida v. Cohen , 887 F.2d 1451 (11th Cir. 1989), wherein the defendant was charged in state court with the murder of her husband. The defendant subpoenaed information from various federal agents and agencies regarding a confidential informant who had information on the activities of Frank Diaz, a fugitive from justice who was initially a suspect in the murder. The Government filed motions to quash and sought a protective order. However, the state court ordered the Government to produce the records for an in camera review. When the Government failed to respond to the order, the court issued a show cause order. As in the instant case, the Government then removed the issue to federal district court pursuant to 28 U.S.C. § 1442(a)(1).

The Cohen court performed a balancing of interests based upon application of the factors set forth by the Supreme Court in Roviaro v. United States, 353 U.S. 53, 62 (1957). The issue on appeal to the Eleventh Circuit was whether the district court had struck the correct balance when it determined that the Government's need to protect the identity of the informant outweighed the defendant's need for the information requested. The Eleventh Circuit remanded the case for reevaluation based upon new information that the fugitive, the initial murder suspect, already knew the identity of the confidential informant, and, therefore, the Government's concerns would need to be reevaluated. As noted by the district judge in the instant case, the Cohen court did not address the issue of sovereign immunity.

Finding the Cohen approach to be the proper one, the district court below applied the factors identified by the Supreme Court in Roviaro v. United States, 353 U.S. 53, 62 (1957) (courts must consider "the particular circumstances of each case, taking into consideration the crime charged, the possible defense, the possible significance of the informer's testimony, and other relevant factors" in balancing the public interest in protecting the flow of information with the individual's right to prepare a defense). The district court concluded that even

10

under this approach it must grant the Government's motion to quash the subpoenas.

Judge Nickerson reasoned that Cromer did not provide the court with specific facts that would likely be contained in his informant file that would establish that he was acting as a federal cooperating individual at the time of his alleged violation. The district court found that Cromer's desire to raise a question as to his guilt in the minds of the jurors, based upon unrelated allegations of his efforts as a cooperator, was an insufficient basis to compel the government to disclose confidential information in violation of applicable regulations. The district court also noted that the prior disclosures by Smith, Welsh, and Hornstein provided Cromer with another means to get the information in front of the jury. Additionally, Cromer would have the opportunity to cross examine Agent Hornstein regarding Cromer's efforts as an informer on behalf of the DEA when Hornstein is presented as a fact witness at the trial. For these reasons, and in light of the policies underlying the doctrine of sovereign immunity, the district court granted the Government's motion to quash the subpoenas. (JA 96-98).

This Court applies a de novo standard of review to the district court's grant of a protective order, quashing state court subpoenas to federal officials, as this issue is decided as a matter of law. West v. Clarke, Murphy Self Employed Pension Plan, 99 F.3d 166 (4th Cir. 1996); Boron Oil Co. v. Downie, 873 F.2d 67 (4th Cir. 1989). We find that the district court did not err in its analysis or application of the relevant statutory and case authority.

Cromer argues that the district court erred by not reviewing his Cooperating Individual File, in camera, prior to ruling on the Government's motion. However, the record reveals that both parties participated in a hearing on the motion and were given ample opportunity to present their respective positions. (JA 51-90). Cromer's attorney offered a proffer of evidence at the hearing before Judge Nickerson (JA 51-54), as did the Government (JA 54-55). After considering these proffers, the district court found that Cromer had presented no more than "unrelated allegations of his efforts as a cooperator." (JA 96). Cromer "may not require the trial court to search through the ... file without first establishing a basis for his claim that it contains material evidence." Ritchie, 480 U.S. at 58 n.15. We find that the record created at the hearing, and the proffers of both parties, along

11

with the written submissions to the district court, provided a sufficient basis for the district court's decision.

Appellant argues to this Court that his Sixth Amendment right to compulsory process will be violated if the subpoenas issued to three Department of Justice officials, which seek to compel their testimony in his state criminal proceeding, are quashed. It is clear that there are limits upon the due process which is accorded a defendant in presenting his defense, and, further, that the right to compulsory process is not absolute. Washington v. Texas, 388 U.S. 14 (1967); Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987). The district court properly balanced Cromer's constitutional claims against the Government's claim of privilege and concluded that the rights articulated by Cromer did not override those presented by the Government. **2**

IV.

Based upon a de novo review of the record, we find that the district court did not err in its determination to quash the subpoenas. First, and most importantly, sovereign immunity bars state compulsory process against these federal officers. Second, even assuming it is correct to balance the federal privilege against Cromer's articulated interests, Cromer has failed to raise any claim sufficient to overcome the government's interest in protecting its confidential law enforcement investigations. Accordingly, the Order of the district court granting the Government's motion for a protective order, quashing the subpoenas, and dismissing the instant action is affirmed.

AFFIRMED

_____

**2** We do not need to examine here the precise contours of the Government's privilege, for Cromer's "unrelated allegations," (JA 96), do not provide him any interest to weigh against the government's undisputed interest in maintaining the secrecy of confidential informant files. See Roviaro, 353 U.S. at 62 ("Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case ..."). Cromer was required to "come forward with something more than speculation as to the usefulness of ... disclosure." United States v. Smith, 780 F.2d 1102, 1108 (4th Cir. 1985) (en banc) (interpreting the classified information privilege).

PHILLIPS, Senior Circuit Judge, dissenting:

The ultimate issue in this case, though infrequently presented, is a difficult and important one: How, if at all, may a defendant in a state criminal prosecution obtain from unconsenting federal officials documentary information[1] in their custody that may be material and favorable to his state-court defense? That question takes on added complication where, as here, the defendant's contested invocation of state subpoena processes to obtain the information is removed, as a separate proceeding, to federal court. At that point, the issue of the sovereign immunity of the federal officials to the state's process, hence of the jurisdiction of the state court to issue it and, derivatively, of the federal removal court's jurisdiction to enforce it, is raised. And, within that sovereign immunity/jurisdictional issue,[2] there is the further issue of the bearing upon it of the state-defendant's assertion of constitutional entitlement to the information, countered by an assertion of governmental privilege against its disclosure.

In those circumstances, what is the procedure by which a federal removal court should address the conflicting assertions of constitutional entitlement to the information on the one hand and both sovereign immunity and governmental privilege on the other? And, what are the substantive principles that control decision on those issues?

I believe that neither the district court nor the majority has fully and correctly identified and dealt with those and related issues that are

_____

[1] The defendant sought both to compel the officials to testify and to produce documentary information. Because it was agreed that the officials would be available for cross-examination at trial, the only issue of consequence concerns production of the documentary information. I therefore address only that.

[2] Though sovereign immunity to suit, being waivable, is not actually a limitation on the subject matter jurisdiction of courts, see Idaho v. Coeur d'Alene Tribe of Idaho, 117 S. Ct. 2028, 2033 (1997) (so noting as to Eleventh Amendment immunity of states), it has sufficient "jurisdictional" characteristics to share many of that doctrine's consequences including, for purposes of this case, two later noted in text: the concept of "derivative" jurisdiction and that of a court's jurisdiction to determine its own jurisdiction.

13

presented in this case. In consequence of that failure, I believe the district court erred in quashing the state court subpoena for lack of state court jurisdiction to issue it. I therefore dissent from the majority opinion and would vacate the district court's judgment and remand for further proceedings.

I start with the controlling principles, then turn to their proper application in this case. In the process, my disagreement with the majority will appear.

I.

1. The invocation by a defendant in a state criminal prosecution of state subpoena processes against an unconsenting federal official acting in his official capacity is effectively an action against the federal government because, though non-monetary in effect, it "interfere[s] with the public administration" by seeking to compel official action at odds with the sovereign's wishes. Boron Oil Co. v. Downie, 873 F.2d 67, 71 (4th Cir. 1989) (quoting Dugan v. Rank, 372 U.S. 609, 620 (1963)).

2. As such, this separate "action" is subject to removal to federal court under the federal officials' removal statute, 28 U.S.C. § 1442. See Louisiana v. Sparks, 978 F.2d 226 (5th Cir. 1992).

3. Because Congress has not waived the federal government's sovereign immunity to suit in state court, issuance of such subpoenas by state courts is barred by that immunity unless in withholding the information sought the official is acting unconstitutionally or in excess of his legal authority. See Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689-690 (1949); cf. Ex parte Young, 209 U.S. 123 (1908) (recognizing comparable exception to States' Eleventh Amendment immunity to suit).

4. Notwithstanding that Congress has waived the federal government's sovereign immunity to such process in federal courts, see 5 U.S.C. § 702 (immunity waived as to suits seeking "relief other than money damages"), removal of such a state court subpoena proceeding to federal court does not confer any power upon the federal court not

14

possessed by the state court. See Minnesota v. United States, 305 U.S. 382, 389 (1939) (removal court's "jurisdiction" is derivative of state court's). In consequence, the sovereign immunity issue for a federal removal court in such a situation is whether sovereign immunity barred issuance of the subpoena by the state court. And that turns on whether either the unconstitutional or ultra vires conduct exceptions could be shown to avoid the otherwise absolute bar of unwaived immunity in the state court. Resolution of that issue by the federal removal court is essentially an exercise of its jurisdiction to determine its own (here "derivative") jurisdiction. See Texas & Pacific Railway Co. v. Gulf, Colorado & Santa Fe Railway Co., 270 U.S. 266, 274 (1926).

5. A state-defendant has a Sixth Amendment right of access under the compulsory process clause to documentary evidence in the custody of third persons that is shown to be material, favorable to his defense, and not merely cumulative. See Washington v. Texas, 388 U.S. 14 (1967) (recognizing compulsory process right in state-defendants to possibly exculpating testimony of third persons despite state-law privilege against disclosure).

6. Even such constitutionally-based rights[3] to disclosure and use of possibly exculpating evidence are not, however, absolute and may have to yield to countering claims of privilege made either by the prosecuting government or by third persons. Compare Davis v. Alaska, 415 U.S. 308 (1974) (holding that Sixth Amendment confrontation right prevailed over state confidential proceedings privilege); Roviaro v. United States, 353 U.S. 53 (1957) (holding that right to a

_____

[3] Such rights may derive in essentially parallel form, depending upon the circumstances, from the compulsory process and confrontation clauses of the Sixth Amendment and the Due Process Clause of the Fifth Amendment, comprising overall what the Supreme Court has said "might loosely be called the area of constitutionally guaranteed access to evidence." United States v. Valenzuela-Bernal, 458 U.S. 858, 867-68 (1982). Where, as in this case, materials are sought from a third person (here the federal government) rather than the prosecuting government, the access right at issue is that of compulsory process rather than of essentially congruent due process. See Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987) (noting essential congruence).

15

fair criminal trial overrode government-asserted informer's privilege and required disclosure of informer's identity and information),**4** with, e.g., United States v. Jenkins, 4 F.3d 1338, 1340-41 (6th Cir. 1993) (holding that, under circumstances, compulsory process right did not override government-asserted informer's privilege).

7. Whether a constitutional right of access or a countering claim of privilege prevails in a particular case must be determined by a fact-specific judicial balancing of the conflicting interests. See Roviaro, 353 U.S. at 62 (prescribing balancing inquiry and outlining factors to be considered in balancing fair trial interests against prosecuting government's informer's privilege: "the crime charged, the possible defenses, the possible significance of the [testimony sought], and other relevant factors").

8. An accused seeking access to documentary materials believed to be material and favorable to his defense is constitutionally entitled, upon making "at least some plausible showing" of the existence, materiality, and favorable quality of the materials, to have them submitted to the trial court for an in camera inspection to determine if they are of that nature. Ritchie, 480 U.S. at 60 (recognizing such a threshold right under the Due Process Clause with respect to materials in custody of prosecuting government agency); Love v. Johnson, 57 F.3d 1305, 1312-13 (4th Cir. 1995) (same). No more than a "plausible showing" is required to trigger the right to in camera judicial inspection because of the practical impossibility in the usual case that an accused can show more. See Ritchie, 480 U.S. at 58 n.15. If the trial court determines that the materials are sufficiently material and favorable to meet the constitutional requirement, the accused then becomes constitutionally entitled to their production for his inspection and use. Id. at 58 (requiring new trial if post-conviction in camera review reveals constitutional right to use of withheld materials).

9. Critical to realization of this procedural right to in camera inspection and determination is that it be independently conducted by

_____

**4** Though Roviaro did not identify the source of the disclosure right it upheld over the claim of privilege, the Court later located it in the Fifth Amendment's Due Process Clause. See United States v. Raddatz, 447 U.S. 667, 679 (1980).

16

the court. Because "the purpose of in camera review inspection is to supplement the government's assessment of materiality with the impartial view provided by the trial judge," United States v. Leung, 40 F.3d 577, 583 (2d Cir. 1994), the right is not adequately protected by the court's simply accepting the government's proffer of non-materiality without conducting its own inspection. Id.; cf. United States v. Nixon, 418 U.S. 683, 673 (1973) (noting in reverse situation that in conducting in camera inspection of materials subpoenaed by Special Prosecutor, "the District Court is not limited to representations of the Special Prosecutor as to the evidence sought").

10. If in camera review reveals entitlement to a compelled disclosure to the defendant of all or portions of inspected materials, the court may then, however, consider in a Roviaro balancing inquiry claims of privilege barring public disclosure and use of the materials as evidence at trial. See Ritchie, 480 U.S. at 57 & n.14 (recognizing propriety of such a two-stage procedure where privilege claimed is a qualified one; reserving question whether any claim of disclosure right could prevail over unqualified non-disclosure privilege). In conducting this balancing inquiry, the court may continue to protect the confidentiality of the materials from public disclosure pending decision by the court by appropriate protective orders and by excising and sealing the materials as deemed necessary. See Nixon, 418 U.S. at 714-16 & n.21 (describing proper procedure for protecting confidentiality during adversarial proceeding to determine third-person privilege claim asserted against document subpoena by Special Prosecutor).

11. To sum up. Where an accused in state court makes a claim of constitutional right to disclosure of documentary information in custody of federal officials (hence to the unconstitutionality of its withholding) and the officials counter with claims of sovereign immunity and privilege, the conflicting claims are conceptually intertwined. The sovereign immunity claim prevails, "jurisdictionally" barring access, unless the withholding is unconstitutional, which depends in turn upon whether the asserted constitutional right of access overrides the privilege. Resolution of the ultimate issue whether access by legal process is "jurisdictionally" barred by sovereign immunity or is enforceable as a matter of constitutional right will therefore emerge from the sequential determinations that are the objects of the first-

17

stage in camera materiality inspection and any follow-up Roviaro balancing inquiry. These then define the constitutionally mandated procedures for resolving the issues presented in this case.

II.

I now turn to the way in which these principles were overlooked or misapplied by the district court and to the remedy required to set the case on proper course.

Interestingly, the state court plainly started out on the right track in applying the constitutionally-mandated procedures. At a hearing on Cromer's "Motion for Subpoena for Tangible Evidence" that specifically identified as its target Cromer's federal"Cooperating Individual File," the state trial judge ordered the Government to submit the file for his in camera inspection. Without any formal reservation or objection, the Government submitted the file. Having reviewed it in camera, the state judge, "finding information that is discoverable" under state law, ordered that the file be made available to Cromer's counsel for his eyes-alone review in the judge's chambers pending further orders of the court. JA 10.

Whether the state court would have followed through in applying the constitutionally prescribed procedures had the Government raised sovereign immunity and non-disclosure privilege objections is unknowable. For at this point, having tested state waters without any formal objection and found them wanting, the Government, as was its right, removed the proceeding to federal court under 28 U.S.C. § 1442. There, the Government moved immediately for quashal of the state subpoena and a complementary protective order, contending that enforcement of the subpoena was barred both by the government's sovereign immunity to suit in state court and by the Justice Department's exercise of its substantive right under Department regulations codified at 28 C.F.R. §§ 16.21 to .29 to deny the access sought by the subpoena. See JA 55 (transcript of hearing).

Countering, Cromer asserted constitutional entitlement to the materials under due process and compulsory process guarantees. He contended that sovereign immunity was not available to bar the state subpoenas issuance and enforcement because compelling disclosure

18

would not have the requisite effect of interfering with public administration. Further, he argued that the Justice Department regulations were invalid as a substantive basis for the Department's denial of access and that aside from them the Government had asserted no privilege against disclosure. On this basis, he sought enforcement of the state court subpoena.

The district court's understanding and resolution of these conflicting contentions is not too clear to me. The court rightly perceived that in view of Cromer's constitutional claims it should reject the Government's base-line contention that sovereign immunity absolutely barred issuance of the state court subpoena. See JA 95-96. Rather, the court thought that because Cromer's "constitutional rights are at stake," "as a matter of equity his due process rights should be balanced against the Government's immunity [sic] from having its employees subpoenaed to testify in state court." JA 95. On that view of the matter, the court then undertook what it characterized as a Roviaro balancing analysis. But that balancing, so far as expressed by the court, was a cursory, essentially one-sided one. It was conducted entirely on the basis of the motion papers before the court and the oral arguments of counsel. Critically, it did not involve in camera inspection of the materials specifically identified in Cromer's motion seeking disclosure. On one side of the matter, the court noted that Cromer "did not provide the court with specific facts that would likely be contained in his informant file that he was acting as a federal cooperating individual at the time of his alleged violation." Then, surmising that Cromer's purpose was "simply to raise a question as to his guilt . . . based on unrelated allegations of his efforts as a cooperator," the court noted that on the other side of the matter,"the Government proffered that the file would show that [Cromer] was in violation of his plea agreement at the time of the state arrest." Without indicating how, even if that were the case, it would necessarily demonstrate that information in the file could not be material and favorable to Cromer's state-court defense, the court summarily concluded that Cromer's showing was "an insufficient basis to compel the Government to disclose confidential information."**5** JA 96-97.

_____
**5** It is unclear what the court considered the regulations' exact legal significance to be. By purporting to balance the interests identified in the

19

This procedure failed to accord Cromer the constitutional protections to which he was entitled under the principles summarized in Part I of this opinion. Cromer had specifically identified for the court a discrete file containing materials that by definition concerned his status as a "cooperating individual" with the federal government in matters related to drug enforcement. His suggestion that it might therefore contain evidence material to his defense in the state drug prosecution was all that was required to make the minimal "plausible showing" that triggered his right to have that file subjected to independent in camera inspection by the court. See Ritchie, 480 U.S. at 59, 60. Instead of according Cromer that essential threshold right, the court first required a more specific showing of contents and their precise materiality than Cromer could as a practical matter know and, accordingly, than the relevant principle requires. **6** Then, compounding the matter, the court simply accepted the Government's countering proffer that the file did not contain information material to any defense available to Cromer but would instead reveal positively inculpating information.

_____

regulations against Cromer's constitutional claim, the court implicitly rejected the Government's contention that the regulations conferred on Department officials an absolute, judicially unreviewable right to deny access. Apparently--despite its cryptic use of"immunity" in describing the governmental interests--the court considered the regulations to confer mere qualified privilege subject to Roviaro balancing. As will appear, the court was surely right in rejecting any claim of absolute privilege, but wrong in believing that the regulations conferred even qualified privilege.

**6** Furthermore, as Cromer points out, the court apparently misperceived the factual defense proffered by Cromer that might be supported by material information in the file. The record indicates that the proffer was not--as the court posited--that the file might show that Cromer was acting under direct orders in engaging in the charged drug transactions, but that they were undertaken as part of a DEA-approved process of gaining access to higher-ups in the drug enterprise being investigated. JA 52, 53. However that may be, the very fact of confusion on this score reveals the need for an actual in camera inspection to determine whether sufficiently identified materials contain information material and favorable to an available defense. That such an inspection might be critical is emphasized by the fact that when conducted by the state court, it resulted in a determination that disclosure was required.

20

This was error that deprived Cromer of his constitutional threshold entitlement to have the material in the file independently inspected "to supplement the Government's assessment of materiality with the impartial view provided by the trial judge." Leung, 40 F.3d at 583 (citation omitted). The district court's order quashing the state subpoena and granting the Government's complementary protective order should therefore be vacated and the matter remanded for proper proceedings. In those proceedings, the district court should first conduct an independent inspection of the file materials to determine whether any portions might be material and favorable to any defense that might be available to Cromer in the state court prosecution. This would obviously require consideration of the elements of the state offense as charged and such factual and legal defenses to it as are available under state law and are plausibly suggested as intended defenses by Cromer. See Roviaro 353 U.S. at 62. If on the basis of that inspection any materials were ordered disclosed to Cromer or his counsel, an appropriate order for further proceedings to consider any claims of evidentiary privilege against their use should be entered. If no information was found sufficiently material and favorable to require disclosure without regard to any claims of privilege, the protective order and that quashing the subpoena should be reinstated. In either event, the materials inspected should be sealed for possible appellate review. See Love, 57 F.3d at 1313.

III.

Because I would vacate and remand for further proceedings, it is necessary to address two critical points in the majority opinion that are at odds with the remedy I would order. Both rely upon the supposed authority of United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951), as recognizing and defining the substantive and procedural effects of the Department of Justice regulations upon which the Government makes its claims of immunity and privilege.

A.

The first point, implicit in the majority's approval of the district court's Roviaro balancing, which accepted that the regulations established an executive non-disclosure privilege, is that the regulations could have that substantive effect. I disagree, believing that the regu-

21

lations could not, under their authorizing statute, have any such substantive effect, and that Touhy does not hold to the contrary. Consequently, I would hold that the Justice Department regulations themselves confer no substantive power on the Department to deny access to properly demanded materials in its files, certainly not as a matter of absolute, judicially unreviewable discretion, nor even as a matter of qualified executive privilege.

The regulations at issue were promulgated pursuant to 5 U.S.C. § 301, which provides:

> The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

The critical regulation sections relied upon by the Government are § 16.22(a)[7] and § 16.26(b).[8]

---

[7] (a) In any federal or state case or matter in which the United States is not a party, no employee or former employee of the Department of Justice shall, in response to a demand, produce any material contained in the files of the Department, or disclose any information relating to or based upon material contained in the files of the Department, or disclose any information or produce any material acquired as part of the performance of that person's official duties or because of that person's official status without prior approval of the proper Department official in accordance with §§ 16.24 and 16.25 of this part.

[8] (b) Among the demands in response to which disclosure will not be made by any Department official are those demands with respect to which any of the following factors exist:

(1) Disclosure would violate a statute, such as the income tax laws, 26 U.S.C. 6103 and 7213, or a rule of procedure, such as the grand jury secrecy rule, F.R.Cr.P., Rule 6(e),

22

The Government contends, and the majority holds, that in combination the first sentence of § 301, as implemented by §§ 16.22(a) and 16.26(b) of the regulations, confers a right in Justice Department officials to deny on the basis of any of the § 16.26(b) factors access by an accused such as Cromer to documentary material in its custody.

As earlier indicated, the Government's basic position seems to have been throughout that the right thus conferred by regulation is an absolute one whose exercise is committed to the unreviewable discretion of the appropriately designated Department official. In consequence, the Government contends, exercise of the right of denial in this case had the effect of confirming (by refusing to waive?) the sovereign immunity of the Department officials to the state-court subpoena. On that view, no Roviaro balancing of Cromer's constitutional claim against Government interests was warranted; the judicial door was closed by the Department's act of denying the demand.[9] The majority seems--though it is not altogether clear--not to have accepted that extreme position. In opining that there was no error in the Roviaro balancing done by the district court, the majority seems to accept that the regulations conferred at most a qualified executive

_____

(2) Disclosure would violate a specific regulation[,]

(3) Disclosure would reveal classified information, unless appropriately declassified by the originating agency,

(4) Disclosure would reveal a confidential source or informant, unless the investigative agency and the source or informant have no objection,

(5) Disclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired,

(6) Disclosure would improperly reveal trade secrets without the owner's consent.

[9] The Government, confronting the district court's rejection of its most extreme position, contends that if balancing was in order, it was properly conducted and led to the correct result. Or so the contention seems to go. See Appellees' Br. at 10, 11.

23

privilege that was subject, as any privilege, to such a balancing inquiry.

Whatever the Government's position and the majority's--whether of absolute right or mere qualified executive privilege deriving from these regulations--I think they are wrong.

The reason is a simple one. Section 301 was intended only to allow agencies to regulate their internal procedures for receiving and processing demands such as Cromer's for access to information in their files. It was not intended to confer on an agency or any of its officials the substantive authority either to withhold information as a matter of absolute discretion or to promulgate and assert any form of executive privilege against disclosure. While the regulations at issue may therefore validly prescribe enforceable procedures for presenting and internally processing such demands, they may not go further and lay down substantive grounds for their denial, either as a matter of unreviewable discretion or as a matter of qualified privilege. To the extent they purport to do the latter, they are invalid. This is borne out by the text and legislative history of § 301, by judicial interpretations, and by the opinion of leading commentators.

The last sentence of § 301 speaks directly to the point: "This section does not authorize withholding information from the public or limiting the availability of records to the public." It was added by a 1958 amendment to § 301's precursor, 28 U.S.C.§ 22 (1952), for the avowed purpose of counteracting perceived abuses by the executive branch which, it was believed, had "twisted [the statute] from its original purpose as a `housekeeping' statute into a claim of authority to keep information from the public," and by interpreting the statute as a broad grant of substantive authority to withhold information, had "let every file clerk become a censor." H.R. Rep. No. 1461, 85th Cong., 2d Sess. 1 (1958).

Courts carefully attending this "Housekeeping" Statute's legislative history have so construed it, some in the process holding invalid agency regulations claimed to confer substantive non-disclosure rights or privileges. See Chrysler Corp. v. Brown, 441 U.S. 281, 310 (1979) (noting, on basis of such a review, that § 301 is not "a substantive grant of legislative power to promulgate rules"); United States ex

24

rel. O'Keefe v. McDonnell Douglas Corp., 132 F.3d 1252, 1255-56 (8th Cir. 1998) (holding invalid, as not authorized by § 301, a substantive Justice Department regulation authorizing non-disclosure of information obtained in defense-contractor investigation); United States v. Henson, 123 F.3d 1226, 1237 (9th Cir. 1997) (holding that while § 301 "does not allow an agency to refuse to disclose information, it does allow an agency to choose who may disclose the information and the procedure to be followed for such a disclosure") (citations omitted); Houston Business Journal, Inc. v. Office of Comptroller, 86 F.3d 1208, 1212 (D.C. Cir. 1996) (holding that § 301 does not "authorize[ ] a federal agency to withhold documents from a federal court" and opining that regulations having that effect would be invalid) (citations omitted); In re Bankers Trust Co., 61 F.3d 465, 470 (6th Cir. 1995) (holding Federal Reserve Board regulation barring release of confidential information not authorized by § 301).

Disregarding the force of these recent decisions, the majority relies on Touhy as having authoritatively established that the current Department regulations do have the substantive effect of an executive privilege against document disclosure. But the Touhy Court, considering in 1951 the effect of a precursor Department order which simply gave to the Attorney General the sole authority to release requested information in Justice Department files, expressly declined to address this very issue. Touhy held only that the order, as promulgated under § 301, was valid in relieving an FBI agent from liability for failing to obey a subpoena duces tecum in the absence of authorization by the Attorney General. The Court was at pains to point out that it addressed only the Department's power under § 301 so to centralize the release authority, that it was not addressing the substantive powers of the Department to determine the conditions for release. Touhy, 340 U.S. at 467-9.

The decided weight of judicial authority and scholarly commentary supports this understanding of Touhy.

As the Eighth Circuit recently pointed out, aside from the fact that Touhy only avowedly upheld the then-governing order in its effect upon "internal administrative procedures," it was decided before the 1958 amendment to § 301 had made it clear that agencies cannot promulgate substantive non-disclosure regulations. See O'Keefe, 132

25

F.3d at 1255, 1256; see also NLRB v. Capitol Fish Co., 294 F.2d 868, 875 (5th Cir. 1961) (observing that since 1958 it has been established that § 301 "cannot be construed to establish authority in the executive departments to determine whether certain papers and records are privileged"); 26 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure: Evidence, § 5682 (1992) (concluding, based upon extensive review of § 301's legislative history, cases (including Touhy) and scholarly comment, that better view is that 1958 amendment, coupled with the recently enacted Federal Rules of Evidence, establish that § 301 confers no power to create substantive privileges by agency regulation).[10]

This does not mean of course that the Government might not in this case invoke executive privileges deriving from other legitimate sources such as the common law informant's privilege recognized and balanced in Roviaro. See Nixon, 418 U.S. at 709-10 (noting existence and sources of various privileges, including executive). Whether any such privilege might be available in respect of the materials at issue is of course not now before this court, and indeed could only be known at this point by the Government which has so far declined to submit the materials for judicial inspection. In ordering remand, I would therefore instruct that in any Roviaro balancing that might be found required, Government claim of privilege could only be based on sources other than these department regulations.

B.

Finally, in an apparent fall-back position, the majority suggests that, per Touhy, the subpoena could properly have been quashed because served upon officials not authorized by the regulations to release the information. Aside from the fact that the Government has not raised this issue,[11] it is without merit.

_____

[10] The majority relies upon Boron Oil Co. v. Downie, 873 F.2d 67 (4th Cir. 1989), as precedent in this circuit for the contrary position that, per Touhy, the regulations do create a substantive executive non-disclosure privilege. But Boron, a civil case, simply assumed this on the assumed authority of Touhy, and did not directly address the issue.

[11] The Government's sole position throughout has been that the agents' refusal to produce the file information was proper on substantive grounds of sovereign immunity and an executive privilege properly exercised under the Department regulations.

26

Touhy still stands for the proposition that 5 U.S.C. § 301 confers on the Department of Justice the authority by regulation to lay down procedural rules for the making and internal processing of demands upon it to produce documentary information in its files, including the centralizing of authority finally to act on particular demands. Hence, it continues to stand as precedent for its narrow holding that a Department agent who had not been authorized to release information by the official having power to order the release could properly decline to obey a subpoena duces tecum issued to him. But, as indicated, Touhy did not purport to decide the issue of the substantive power of the official with authority under the then regulation to withhold the information, because he was "not before the trial court." Touhy, 340 U.S. at 467. Justice Frankfurter, specially concurring, noted the narrowness of the holding and pointed out its implication that the official with authority must be subject to process in order to allow an effective substantive challenge to decisions to withhold "documents within his possession that are relevant to a judicial proceeding." Id. at 472-73 (Frankfurter, J., concurring).

At the time Touhy was decided, the Department had promulgated a simple Department of Justice Order which forbade any officer or employee to produce requested information "except in the discretion of the Attorney General, the Assistant to the Attorney General, or an Assistant Attorney General Acting for him." See Touhy, 340 U.S. at 463 n.1. Extrapolating from Touhy, and surely with Justice Frankfurter's concurrence in mind, courts since have assumed that to the extent Department regulations identify an official, or officials, with final authority, that official is the only proper, but a necessarily available, target for a subpoena duces tecum. At the time of Touhy, that official was identifiable as a matter of record as either the Attorney General, or his Assistant, or a properly delegated Assistant Attorney General. And, Touhy warned, persons seeking information must subpoena the proper official at peril of issuing one ineffectual as substantive challenge. In Touhy's immediate aftermath therefore, a person desiring to raise such a substantive challenge was able to identify the clearly identified ultimate decision-maker and thereby to lay the basis for the judicial challenge that Justice Frankfurter had pointed out must be possible.

But the simple order at issue in Touhy no longer exists. In its place, the present regulations promulgated in 1980 lay down a much more

27

elaborate and complicated procedure--both for making and for internally processing demands upon the Department for documentary (or other) information. Most critically, they diffuse the final authority to release demanded information among a set of senior officials that does not, in fact, include the Attorney General, and on internal processing contingencies that make identification of the ultimate decision-maker impossible at the time a subpoena is issued.

Specifically, as they now stand, the regulations at issue provide that (1) a person such a Cromer may properly make his "demand" for documentary information by a subpoena duces tecum, see § 16.21(a)(2); (2) served upon an "employee" of the Department who need not be the official with final authority to determine the Department's response, see § 16.22(a); (3) but who is then required to "immediately notify the U.S. Attorney for the district where the issuing authority is located," see § 16.22(b); (4) who, in turn, is required to "follow procedures set forth in § 16.24," see § 16.22(b); (5) which, in summary, may result in a final decision on the Department's response being made by the U.S. Attorney alone, or in combination with the appropriate division head, or in case of disagreement between those two, by an Assistant Attorney General, see § 16.24; (6) with the possibility, depending upon internal developments, that decision may finally be kicked up to the Deputy Attorney General or an Associate Attorney General, see § 16.25.

By these much more elaborate and detailed procedures, the current regulations effectively require no more of a demander such as Cromer than that he subpoena the presumed custodian of documents, leaving it then to internal procedures beyond his control to route the demand to the ultimate authorizer. Because under these regulations the identity of that ultimate authority is beyond the demander's control and knowledge, he could not be required to subpoena that person or indeed to reach him by any other procedural device. It therefore is no longer possible to extrapolate from Touhy (as some courts continue erroneously to do without taking the new regulations' regime into account) that the only proper (and an always available) target of a subpoena duces tecum is the Attorney General or his delegate of record.

Here Cromer did exactly what the current regulations required to force a response by the Department to his "demand." The only thing

28

he was required to do beyond issuing a subpoena to the assumed custodian or controller of the files he sought was to submit, upon request of the U.S. Attorney, "a summary of the information sought and its relevance to the proceeding." <u>See</u> § 16.22(d). This he did in his letter to the U.S. Attorney. (No "affidavit" was required as to the documents, in contrast to testimonial evidence, <u>see</u> § 16.22(c)).

Concurring in <u>Touhy</u>, Justice Frankfurter admonished that the Department's power by regulation to centralize its internal processes could not be taken to the point of making it impossible for one seeking information to reach some identifiable target. <u>Id.</u> at 473 (observing that this "would be to apply a fox-hunting theory of justice that ought to make Bentham's skeleton rattle").**12** I believe the only way to interpret the present regulations to avoid that unacceptable consequence is to treat them as having constituted any Department "employee" who is served with a subpoena as effectively the authorized process agent for the official to whom the demand is ultimately routed according to the prescribed Department procedures. That is exactly the design of the regulations which rely upon that employee to set in motion a process whose unfolding is completely beyond the knowledge of the person making his demand by subpoena. I would so hold in rejecting any claim that Cromer somehow defaulted procedurally in targeting improper Department officials.

_____

**12** As an aside, perhaps to accommodate Justice Frankfurter's admonition that an effective substantive challenge to access denials must always be possible, the majority suggests that Cromer might make such a challenge by an administrative proceeding under 5 U.S.C. § 702 to declare invalid the final agency decision to deny access. No such theory was urged by the Government nor considered by the district court, and it should not be considered properly before this court. If it were, I would disagree both with the premise that such a proceeding is needed because a subpoena cannot serve and with the premise that it could properly serve the purpose. Whatever the merits of a view that such a proceeding might adequately serve in a civil action, I am satisfied that it could not constitutionally serve in a criminal case. On that, I agree with Judge Norris's demonstration of its practical infeasibility as a means for a criminal defendant to obtain exculpatory information in advance of or during a criminal proceeding. <u>See In re Boeh</u>, 25 F.3d at 770 n.4 (Norris, J., dissenting).