# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MIR AIMAL KASI,
            *Petitioner-Appellant,*

v.

RONALD J. ANGELONE, Director of
the Virginia Department of
Corrections,
            *Respondent-Appellee.*

No. 02-2

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Jerome B. Friedman, District Judge.
(CA-00-470-2)

Argued: June 5, 2002

Decided: August 15, 2002

Before WILKINS, TRAXLER, and KING, Circuit Judges.

Dismissed by published opinion. Judge Traxler wrote the opinion, in
which Judge Wilkins and Judge King joined.

## COUNSEL

**ARGUED:** Richard Joshua Cromwell, MCGUIRE WOODS, L.L.P.,
Norfolk, Virginia; Charles Russell Burke, Virginia Beach, Virginia,
for Appellant. Katherine P. Baldwin, Senior Assistant Attorney Gen-
eral, OFFICE OF THE ATTORNEY GENERAL, Richmond, Vir-
ginia, for Appellee. **ON BRIEF:** Jerry W. Kilgore, Attorney General

of Virginia, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

---

**OPINION**

TRAXLER, Circuit Judge:

Petitioner Mir Aimal Kasi was convicted by a Virginia state court jury of capital murder, murder, malicious wounding, and related firearm charges arising out of the slaying of two Central Intelligence Agency ("CIA") employees and the shooting of three others as each was en route to work on January 25, 1993. The Virginia Supreme Court upheld the convictions and sentences on direct appeal, and denied Kasi's petition for state habeas relief. Kasi now appeals the district court's denial of his federal petition for writ of habeas corpus, *see* 28 U.S.C.A. § 2254 (West 1994 & Supp. 2002), raising a number of claims. Because the state court's decisions are neither contrary to, nor an unreasonable application of, clearly established federal law, as decided by the Supreme Court, we conclude that Kasi is not entitled to habeas relief. Accordingly, we deny Kasi a certificate of appealability, and dismiss his appeal.

I.

A.

According to the facts as found by the Virginia Supreme Court, *see Kasi v. Commonwealth*, 508 S.E.2d 57 (Va. 1998), on the morning of January 25, 1993, a gunman stopped his automobile behind a line of automobiles waiting to turn into the main entrance to the headquarters of the CIA in Fairfax County, Virginia, emerged from his vehicle, and opened fire on the other drivers with an AK-47 assault rifle. Frank Darling and Lansing Bennett, both of whom were employed by the CIA, were killed. Nicholas Starr, Calvin Morgan, and Stephen Williams, also employees of the CIA, were wounded. All five victims were driving separate automobiles.

The gunman was subsequently identified as Mir Aimal Kasi, a/k/a Mir Aimal Kansi, a native of Pakistan who was working as a driver

for a local courier service and living in an apartment in Reston with a friend, Zahed Mir, at the time of the shootings. Kasi fled to his home country the day after the shootings and, two days later, was reported to police as a "missing person" by Zahed Mir. On February 8, 1993, police searched Mir and Kasi's apartment and discovered the weapon used in the shootings. Kasi had purchased the gun in Fairfax County three days before the shootings.

On February 16, 1993, Kasi was indicted in Virginia state court for the capital murder of Darling as part of the same act that killed Bennett, *see* Va. Code Ann. § 18.2-31(7) (Michie Supp. 2001); the murder of Bennett, *see* Va. Code Ann. § 18.2-32 (Michie Supp. 2001); the malicious woundings of Starr, Morgan, and Williams, *see* Va. Code Ann. § 18.2-51 (Michie 1996); and five charges of using a firearm in the commission of these felonies, *see* Va. Code Ann. § 18.2-53.1 (Michie 1996). Shortly thereafter, an unlawful flight warrant was issued for Kasi by a United States Magistrate Judge in the Eastern District of Virginia, and the CIA and FBI embarked upon an extensive investigation to locate and return Kasi to the United States for trial.

Over the next four and one-half years, Kasi remained uncaptured, traveling in Afghanistan and returning to Pakistan only for brief visits. Then, in the early morning hours of June 15, 1997, FBI agents, including Agent Bradley J. Garrett, located and abducted Kasi from a hotel room in Pakistan. He was hooded, shackled, and transported by vehicle and air to an undisclosed location where he was held in a jail-like facility. Two days later, Kasi was transported by military aircraft from Pakistan to Fairfax County, Virginia, still in the custody of FBI agents, and delivered to the Commonwealth of Virginia for prosecution. The place of Kasi's detention prior to his being returned to the United States, and the identities of any foreign persons involved in his capture and return, have not been disclosed due to security concerns.

During the flight to the United States, Kasi signed a written waiver of his rights and gave an oral and written confession to the crimes to Agent Garrett. The confession was summarized by the Virginia Supreme Court as follows:

In the written statement, [Kasi] confirmed he purchased the AK-47 rifle and about 150 rounds of ammunition several days before the incident in question. He said he drove his pickup truck to the scene, "got out of my vehicle & started shooting into vehicles stopped at a red light." Continuing, he stated that "I shot approximately 10 rounds shooting 5 people. I aimed for the chest area of the people I shot. I then returned to my truck & drove back to my apartment." He also stated that "several days before the shooting I decided to do the shooting at the CIA or the Israeli Embassy but decided to shoot at the CIA because it was easier because CIA officials are not armed."

As part of his oral statement to Garrett, [Kasi] enumerated political reasons "why he wanted to do this shooting." He said he was "upset" because U.S. aircraft had attacked parts of Iraq, he was "upset with the CIA because of their involvement in Muslim countries," and he was concerned with "killing of Pakistanians by U.S. components." When Garrett asked [Kasi] "why he stopped shooting," he replied "there wasn't anybody else left to shoot." When asked about the gender of those shot, [Kasi] replied "that he only shot males because it would be against his religion to shoot females."

*Kasi*, 508 S.E.2d at 61-62.

Upon his return to Virginia, Kasi was appointed counsel, and pled not guilty to the indictment. On November 10, 1997, after a six-day trial, the jury convicted Kasi of the charges in the indictment. For the first-degree murder of Bennett, the jury fixed Kasi's sentence at life imprisonment plus a $100,000 fine. On each of the malicious shooting convictions, the jury fixed Kasi's punishment at 20 years imprisonment and a fine of $100,000; and for the five firearms offenses, the jury fixed Kasi's punishment at two years for the first conviction and four years for each of the other four convictions.

A separate three-day capital sentencing proceeding was held on November 14, 1997 for the capital murder of Darling, *see* Va. Code Ann. § 19.2-264.4 (Michie 2000), after which the jury fixed Kasi's

punishment for the murder of Frank Darling at death, based upon a finding that the offense was "outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or an aggravated battery to the victim." Va. Code Ann. § 19.2-264.2 (Michie 2000). The state trial court thereafter imposed the sentences as recommended.

On direct appeal, the Virginia Supreme Court affirmed Kasi's conviction and death sentence, *see Kasi*, 508 S.E.2d at 68, and the United States Supreme Court denied his petition for writ of certiorari, *see Kasi v. Virginia*, 527 U.S. 1038 (1999). Kasi then filed a petition for a writ of habeas corpus in the Virginia Supreme Court. The court dismissed the petition, and denied rehearing, and the United States Supreme Court again denied certiorari review. *See Kasi v. Angelone*, 531 U.S. 894 (2000).

## B.

After obtaining a stay of the state court's order of execution from the United States District Court for the Eastern District of Virginia, Kasi filed a petition for writ of habeas corpus under 28 U.S.C.A. § 2254 in the district court. In the petition, Kasi raised three claims pertinent to this appeal:

1. The trial court lacked personal jurisdiction over him because he was abducted in violation of an Extradition Treaty in force between the United States and Pakistan;

2. He was improperly denied access to material evidence possibly favorable to his defense by the trial court's refusal to enforce subpoenas served on the FBI, CIA, and other federal agencies; and

3. The trial court compromised his right to trial by an impartial jury by refusing his request to conduct individual voir dire of the jury members to determine if they had acquired knowledge of the murder of four Americans which had occurred in Karachi, Pakistan, while Kasi's trial was in progress.

*See Kasi v. Angelone*, 200 F. Supp. 2d 585, 591 (E.D. Va. 2002).[1] The magistrate judge concluded that all claims were exhausted, *see* 28 U.S.C.A. § 2254(b)(1)(A), but that none entitled him to habeas relief, *see* 28 U.S.C.A. § 2254(d), and recommended that the habeas petition be dismissed. The district court adopted the recommendation, dismissed the petition, and denied Kasi a certificate of appealability under 28 U.S.C.A. § 2253(c)(2) (West Supp. 2002) (providing that, in order to obtain a certificate of appealability, the petitioner must make "a substantial showing of the denial of a constitutional right"). *See Kasi*, 200 F. Supp. 2d at 602.

## C.

On appeal, the Commonwealth asserts that we are barred from considering Kasi's first claim under 28 U.S.C.A. § 2254(e) because Kasi seeks to rely upon evidence that was not first presented to the state court for its consideration. The Commonwealth asserts that we are also barred from considering Kasi's remaining two claims because he either did not exhaust the claims in state court or procedurally defaulted the claims in the state court proceedings. Alternatively, the Commonwealth asserts that all three claims for habeas relief are without merit.

Like the district court, we conclude that Kasi's claims on appeal have been adjudicated on the merits by the Virginia Supreme Court. Therefore, we review Kasi's claims under 28 U.S.C.A. § 2254(d), under which we may not grant federal habeas relief unless we conclude that Virginia's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1); *see Williams v. Taylor*, 529 U.S. 362, 402-03 (2000). A state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court

---

[1]As a fourth claim, Kasi asserted that he was denied his constitutional right to confront and cross-examine FBI Agent Garrett because the court refused to permit Garrett to be examined with regard to certain classified information. Kasi has not pursued this claim on appeal.

decides a case differently than th[e] Court has on a set of materially indistinguishable facts," *Williams*, 529 U.S. at 413. A state court decision "involve[s] an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), if the state court decision "identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* An objectively "*unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Id.* at 412. Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable" for habeas relief to be granted. *Id.* at 411.

## II.

We begin with Kasi's claim that the state trial court lacked personal jurisdiction over him because he was illegally abducted and forcibly removed from his home country of Pakistan by FBI agents in violation of a 1931 Extradition Treaty between the United States and the United Kingdom, which was in force between the United States and Pakistan.[2]

## A.

Under this country's jurisprudence, it has long been held that a criminal defendant who has been *abducted* to the United States from a foreign nation with which the United States has an extradition treaty does not thereby acquire a defense to the jurisdiction of the courts within this country. *See Ker v. Illinois*, 119 U.S. 436, 444 (1886) (rejecting defendant's claim that he was illegally subjected to trial in Illinois where a person acting on behalf of the United States govern-

---

[2]Throughout the state and federal proceedings involving Kasi, the Commonwealth has agreed that the 1931 Extradition Treaty between the United States and the United Kingdom, Pakistan's former colonial sovereign, has been continued in force by the Islamic Republic of Pakistan and, therefore, governs extradition proceedings between the two countries.

ment, although armed with a warrant to effectuate the defendant's removal from Peru pursuant to the applicable extradition treaty between the countries, opted instead to forcibly abduct defendant and return him to the United States without Peruvian assistance); *cf. Frisbie v. Collins*, 342 U.S. 519, 522 (1952) (relying upon *Ker* to hold, in the context of a defendant's domestic abduction from the state of Illinois to the state of Michigan for trial, that the power of a court to try a defendant is not impaired by the fact that the defendant was brought within the court's jurisdiction by reason of a "forcible abduction"). As noted in *Frisbie*, the Supreme Court:

> has never departed from the rule announced in *Ker v. Illinois*, that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a "forcible abduction." No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

*Id.* at 522 (citation and footnote omitted); *see also United States v. Porter*, 909 F.2d 789, 791 (4th Cir. 1990) (noting this circuit's adherence to the doctrine announced in *Ker* and *Frisbie* to reject criminal defendants' challenge to their involuntary removal from the Philippines and return to the United States for trial); *United States v. Wilson*, 721 F.2d 967, 972 (4th Cir. 1983) (rejecting criminal defendant's challenge to district court's jurisdiction on the grounds that he was "tricked" by the lies of an acquaintance working for the government into leaving Libya (where he was safely a fugitive from justice) and traveling to the Dominican Republic, where he was seized by United States agents and returned to the United States for trial).

In *United States v. Rauscher*, 119 U.S. 407 (1886), however, the Supreme Court interpreted an extradition treaty between Great Britain and the United States, and held that a criminal defendant who had

been returned to the United States from a foreign nation by virtue of extradition proceedings under an extradition treaty could only be tried for offenses charged in the extradition request, "until a reasonable time and opportunity have been given him, after his release or trial upon such charge, to return to the country from whose asylum he had been forcibly taken under those proceedings." *Id.* at 430.

In *United States v. Alvarez-Machain*, 504 U.S. 655 (1992), the Court addressed a similar, but slightly different situation from that presented in *Ker*, and reconciled its holdings in *Ker* and *Rauscher*. Specifically, unlike in *Ker*, agents of the Drug Enforcement Administration ("DEA") were directly involved in the forcible abduction of a physician suspected of aiding the torture and ultimate murder of an undercover DEA agent operating in Mexico, and in effectuating the physician's removal from Mexico and return to the United States for trial on the charges. The Mexican government protested the action as a violation of the extradition treaty in effect between the United States and Mexico. *See id.* at 657.

On appeal, the United States Supreme Court rejected the defendant's claim that the treaty prohibited the United States government from forcibly abducting a fugitive within the borders of Mexico. Specifically, the Court noted that the express language of the treaty "d[id] not purport to specify the only way in which one country may gain custody of a national of the other country for the purposes of prosecution," *id.* at 664, and "d[id] not support the proposition that the Treaty prohibits abductions outside of its terms," *id.* at 666. The Court also refused to *imply* a term, based upon international practice and precedent, that would "prohibit[] prosecution where the defendant's presence is obtained by means other than those established by the Treaty." *Id.* The Court's willingness to imply a term prohibiting the trial and conviction of an extradited defendant for a crime not specified in the extradition request in *Rauscher* was distinguishable, the Court held, because such a term was justified by the express requirement that evidence establishing probable cause of the crime be presented before extradition was required. *See Alvarez-Machain*, 504 U.S. at 669.

In sum, although the terms of an extradition treaty might limit a court's ability to prosecute a defendant who has been returned to the United States by virtue of the treaty in certain circumstances, the

Court has plainly held that an extradition treaty does not divest courts of jurisdiction over a defendant who has been abducted from another country where the terms of the extradition treaty do not prohibit such forcible abduction. *See Alvarez-Machain*, 504 U.S. at 670; *United States v. Noriega*, 117 F.3d 1206, 1213 (11th Cir. 1997) ("Under *Alvarez-Machain*, to prevail on an extradition treaty claim, a defendant must demonstrate by reference to the express language of a treaty and/or the established practice thereunder, that the United States affirmatively agreed not to seize foreign nationals from the territory of its treaty partner.").

B.

Under the terms of the Extradition Treaty relied upon by Kasi, the signatory countries have agreed:

> to deliver up to each other, under certain circumstances and conditions stated in the present Treaty, those persons who, being accused or convicted of any of the crimes or offences enumerated in Article 3, committed within the jurisdiction of the one Party, shall be found within the territory of the other Party.

J.A. 609. "Murder (including assassination, parricide, infanticide, poisoning), or attempt or conspiracy to murder" is covered by Article 3(1) of the Extradition Treaty. J.A. 610.

Before the Virginia state court, Kasi argued that he was apprehended by FBI agents in violation of the Extradition Treaty and, therefore, that the trial court lacked jurisdiction over him. "[T]he 'sanction' for violation of the treaty," Kasi argued, "should be reversal of the capital murder conviction and 'repatriation to Pakistan without prejudice for a new trial.'" *Kasi*, 508 S.E.2d at 62. The circumstances of Kasi's abduction from Pakistan are well-documented. According to the Virginia Supreme Court:

> Near 4:00 a.m. on June 15, 1997, Agent Garrett and three other armed FBI agents, dressed in "native clothing," apprehended [Kasi] in a hotel room in Pakistan. [Kasi] responded

to a knock on the room's door and the agents rushed inside. [Kasi], who has "a master's degree in English," immediately began screaming in a foreign language and refused to identify himself. After a few minutes, [Kasi] was subdued, handcuffed, and gagged. Garrett identified him through the use of fingerprints. During the scuffle, [Kasi] sustained "minor lacerations" to his arm and back.

When the agents left the hotel with [Kasi] in custody, he was handcuffed and shackled, and a hood had been placed over his head. He was transported in a vehicle for about an hour to board an airplane. During the trip, Garrett told [Kasi] he was an FBI agent.

The ensuing flight lasted "a little over an hour." After the plane landed, [Kasi] was transferred to a vehicle and driven for about 40 minutes to a "holding facility" where he was turned over to Pakistani authorities. The FBI agents removed [Kasi]'s handcuffs, shackles, and hood when the group arrived at the holding facility, but the persons in charge of the facility put other handcuffs on him. [Kasi] was placed in one of the eight cells in the facility, where he remained until the morning of June 17.

During [Kasi]'s stay in the facility, the FBI agents never left his presence or allowed him to be interrogated or "harassed." He was allowed to eat, drink, and sleep. On two occasions, the agents removed [Kasi] from his cell to "look at his back and look at his arm" and to take his blood pressure and pulse. The agents did not interrogate [Kasi] in the holding facility and made certain he was treated "fairly and humanely."

On June 16, "late in the day," Garrett was advised by an official at the U.S. Embassy in Pakistan that [Kasi] would be "released" the next morning. On June 17 near 7:00 a.m., [Kasi] "was allowed to be released" from the facility in the custody of the FBI agents. He was handcuffed, shackled, and hooded during a 15-minute ride to an airplane. Once on

the plane, the hood was removed. Shortly after boarding the aircraft, a physician checked [Kasi]'s "well-being."

During the 12-hour flight to Fairfax County, Garrett first conducted a "background" conversation with [Kasi], discussing "his life in the United States, where he lived, where he worked." Garrett knew, from his four-and-one-half-year search for [Kasi], that he was a Pakistani national. [Kasi] was not a U.S. citizen and he had not returned to the United States after he fled on January 26, 1993.

*Kasi*, 508 S.E.2d at 60-61.

Due to security concerns, the record is silent as to what extent foreign nationals were involved in Kasi's capture, initial imprisonment, and return to the United States.[3] There is no dispute, however, that Kasi's forcible seizure in Pakistan and return to the United States were not accomplished pursuant to the Extradition Treaty in force between the United States and Pakistan. Rather, Kasi was apprehended in Pakistan by federal officers in possession of a federal warrant authorizing his arrest for fleeing the jurisdiction to avoid being captured, and then held by United States officials in a secret Pakistani location pending word from the United States Embassy that Kasi could be returned to the United States.

Presented with these facts, and relying principally upon *Ker* and *Alvarez-Machain*, the Virginia Supreme Court rejected Kasi's claim on the merits. The Virginia Supreme Court held as follows:

In the present case, as in *Alvarez-Machain* and *Ker*, [Kasi]'s seizure in a foreign country and his return to this country were not accomplished pursuant to an extradition treaty. The treaty language here does not expressly or impliedly prohibit

---

[3]The state trial court conducted an *in camera* interview of Agent Garrett on this issue. According to a memorandum prepared by the court to memorialize the meeting, Garrett informed the court that the CIA's confidential contacts in Pakistan would be compromised if additional information was offered as to who was present and that any specifics as to the Pakistani government's involvement would be dangerous to reveal.

prosecution in the United States where the defendant's presence was obtained by forcible abduction. Like the treaty in *Alvarez-Machain*, this treaty "does not purport to specify the only way in which one country may gain custody of a national of the other country for the purposes of prosecution." In sum, [Kasi] was not "extradited" under the provisions of this treaty.

*Kasi*, 508 S.E.2d at 63 (quoting *Alvarez-Machain*, 504 U.S. at 664) (internal citation omitted).[4]

The district court held that the state court's ruling was not contrary to nor an unreasonable application of pertinent Supreme Court precedent, and we agree. As correctly noted by the Virginia Supreme Court, because there is no provision in the Extradition Treaty between the United States and Pakistan that expressly prohibits the United States from forcibly abducting a defendant from within Pakistani borders, the state trial court did not lack jurisdiction over Kasi.

## C.

In his petition for writ of habeas corpus before the district court, however, Kasi pursued a jurisdictional claim that is slightly different from the one he pursued before the Virginia Supreme Court. Specifically, after Kasi filed his petition for writ of habeas corpus with the district court raising his jurisdictional claim and the government filed its motion to dismiss, Kasi sought to introduce several documents

---

[4]In pretrial motions, Kasi challenged jurisdiction and moved to suppress evidence stemming from the FBI's seizure of him based on the unreasonableness of the seizure. The trial court ruled that Kasi did not have standing to challenge the reasonableness of the FBI's seizure of him. *Cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 261 (1990) (holding that the Fourth Amendment does not apply to "the search and seizure by United States agents of property that was owned by a nonresident alien and located in a foreign country"). The trial court also rejected Kasi's motion to suppress the evidence based upon an alleged violation of the Vienna Convention on Consular Relations, holding that it does not give legal, enforceable rights to individuals. Kasi does not now challenge the resolution of these issues.

which were never presented to the state court for its consideration. Kasi contends that these documents demonstrate that in April 1993, shortly after authorities seized the AK-47 rifle and other evidence from Kasi's apartment in Virginia and learned that Kasi had fled to Pakistan, the United States initiated extradition proceedings with the Pakistani government for the return of Kasi pursuant to the Extradition Treaty.

The first document is a sheet purporting to be from the High Court of Lahore, Pakistan. Although noting the lack of any ability to determine whether the document was authentic or that it represented an accurate translation of the events discussed within it, the district court ruled that the government "los[t] nothing" by admitting the document and accepted the document into the record. J.A. 601. Several weeks later, Kasi filed a supplemental motion to introduce three additional documents that he contended would verify the authenticity and accuracy of the translation. The first of these additional documents purports to be a communication from the United States Secretary of State to the American Embassy in Pakistan, directing the Embassy to submit a formal request to the government of Pakistan for Kasi's extradition. The second purports to be a formal request for extradition dated April 7, 1993, and directed to the Ministry of Foreign Affairs of the Islamic Republic of Pakistan from the United States Embassy. The third purports to be a confirmation that the extradition request was delivered to the Pakistani government on that date. The district court again accepted the documents over the Commonwealth's objection.

Having presented this evidence, Kasi now contends that *Alvarez-Machain* does not control because, unlike in that case, the United States government had initiated extradition proceedings with the Pakistani government pursuant to the treaty. Once the extradition process was initiated by the United States under the Extradition Treaty, Kasi argues, the United States was prohibited from ignoring that process in favor of forcible abduction. And, accordingly to Kasi, the government was required to complete the formal extradition process set forth in the treaty with the Pakistani government.

1.

As an initial matter, we note that, because Kasi's argument relies upon facts that were neither argued nor established before the Vir-

ginia Supreme Court — specifically, that the United States had initi-
ated extradition proceedings with Pakistan — Kasi was required to
establish that he was entitled to an evidentiary hearing on this issue
under 28 U.S.C.A. § 2254(e) to demonstrate those facts.

In a habeas proceeding, "a determination of a factual issue made
by a State court shall be presumed to be correct," and "[t]he applicant
shall have the burden of rebutting the presumption of correctness by
clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1). The pris-
oner is not permitted to develop new facts in support of a claim in
federal court except in very narrow circumstances. Specifically, the
prisoner must demonstrate that:

> (A) the claim relies on (i) a new rule of constitutional law,
> made retroactive to cases on collateral review by the
> Supreme Court, that was previously unavailable; or (ii) a
> factual predicate that could not have been previously discov-
> ered through the exercise of due diligence; and (B) the facts
> underlying the claim would be sufficient to establish by
> clear and convincing evidence that but for constitutional
> error, no reasonable factfinder would have found the appli-
> cant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2).

The government asserts that the district court improperly admitted
and considered the extradition documents because Kasi's failure to
obtain and present these documents to the state court demonstrates a
lack of diligence, which bars the claim from review under 28
U.S.C.A. § 2254(e)(2). *See Williams v. Taylor*, 529 U.S. 420, 435
(2000). For his part, Kasi admits that he did not develop this aspect
of his jurisdictional claim in state court, but claims that the district
court properly considered the evidence because he met the conditions
of § 2254(e)(2). *See Williams*, 529 U.S. at 430. Specifically, Kasi
asserts that he could not have discovered the existence of the United
States' extradition request because the request had been designated
"confidential" when made and the FBI and CIA refused to disclose
classified information during the state court proceedings for security
reasons. Accordingly, he asserts that he was diligent in his efforts.

Having reviewed the record, we question whether Kasi made the requisite showing before the district court that would entitle him to introduce new facts and evidence into this federal habeas proceeding. However, the district court did not address § 2254(e)'s restrictions before admitting the additional documents and, given the somewhat unique circumstances in this case (and, in particular, the United States government's need to maintain the confidentiality of certain information pertaining to Kasi's apprehension and return to the United States for trial), the record before us is unclear as to whether Kasi could, in fact, have discovered the existence of the extradition request through the exercise of due diligence during the state court proceedings. Nevertheless, we need not remand for an evidentiary hearing regarding the extradition process to address Kasi's jurisdictional claim because, even if we assume that the United States had formally initiated extradition proceedings under the Extradition Treaty as now claimed, the United States government's act of forcibly abducting Kasi in lieu of pursuing the extradition process also did not deprive the state court of jurisdiction over him.

2.

The evidence Kasi seeks to rely upon in his federal habeas claim demonstrates, at most, that the United States issued a formal extradition request to the Pakistani government in April 1993, immediately after the crimes were committed and Kasi was indicted. However, it remains undisputed that nothing happened pursuant to the extradition process. Kasi's seizure in Pakistan and his return to the United States in 1997 — four years after the supposed request was issued — was not accomplished pursuant to an extradition request or otherwise pursuant to the Extradition Treaty relied upon by Kasi to challenge jurisdiction. Rather, Kasi was located and abducted by FBI agents operating in Pakistan, an act that was not prohibited by the Extradition Treaty and that did not divest the Virginia state court of jurisdiction to try Kasi for the offenses committed in Virginia.

As noted by the Court in *Alvarez-Machain*:

In the absence of an extradition treaty, nations are under no obligation to surrender those in their country to foreign authorities for prosecution. Extradition treaties exist so as to

impose mutual obligations to surrender individuals in certain defined sets of circumstances following established procedures. The Treaty thus provides *a mechanism* which would not otherwise exist, requiring, under certain circumstances, the [signatory countries] to extradite individuals to the other country, and establishing the procedures to be followed when the Treaty is invoked.

504 U.S. at 664-65 (citations omitted) (emphasis added). Like the treaty at issue in *Alvarez-Machain*, the treaty between the United States and Pakistan contains no provision that bars forcible abductions, nor does it otherwise "purport to specify the *only* way in which one country may gain custody of a national of the other country for the purposes of prosecution." *Id.* at 664 (emphasis added). Nor does the treaty provide that, once a request for extradition is made, the procedures outlined in the treaty become the sole means of transferring custody of a suspected criminal from one country to the other.

Finally, because Kasi was not returned to the United States via extradition proceedings initiated under the Extradition Treaty between the United States and Pakistan, Kasi's reliance upon *United States v. Rauscher* does not avail him. In *Rauscher*, the defendant "came to this country clothed with the protection which the nature of such [extradition] proceedings and the true construction of the [extradition] treaty gave him" *because* he was surrendered to this country pursuant to the extradition treaty. *Ker*, 119 U.S. at 443 (citing *Rauscher*, 119 U.S. at 425). In particular, Rauscher could be tried by the courts of this country, but *only* for those offenses contained in the warrant of extradition. The defendant in *Ker*, in contrast, was "forcibly and with violence" kidnapped from Peru, and returned to Illinois to answer for alleged crimes committed there, *in disregard of* a warrant issued by the President of the United States which directed that the messenger sent by the President "receive the defendant from the authorities of Peru . . . in compliance with the Treaty between the United States and Peru on that subject." *Ker*, 119 U.S. at 438. Thus, in *Ker*, the United States government had also initiated the extradition process.

In conclusion, Kasi enjoyed no right to be repatriated to Pakistan under the Extradition Treaty between the United States and Pakistan for formal extradition proceedings because he was not seized or

returned to this country in violation of the terms of that treaty. And, even if we were to accept that formal extradition proceedings had been initiated against Kasi pursuant to the treaty, that fact "is irrelevant in view of the Supreme Court's holding that the extradition treaty does not govern the legality of forced abductions." *United States v. Chapa-Garza*, 62 F.3d 118, 121 (5th Cir. 1995) (rejecting claim that *Alvarez-Machain* does not control where extradition proceedings were pending at the time of a fugitive's abduction from a foreign country).

### D.

Having considered Kasi's jurisdictional challenge, with and without the new evidence sought to be introduced, we are confident that the Virginia Supreme Court's rejection of Kasi's jurisdictional challenge was not contrary to nor an unreasonable application of relevant Supreme Court precedents. Kasi was forcibly abducted by United States officials and returned to this country, perhaps with the acquiescence of the Pakistani government or other Pakistani citizens, but not in violation of the terms of the Extradition Treaty between the two countries. Accordingly, Kasi is not entitled to federal habeas relief on this basis.

### III.

Kasi's next claim is that he may have been denied access to potentially exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), because the trial court refused to enforce a subpoena issued to the FBI for its investigation files and the Commonwealth's attorney did not conduct an independent review of the FBI's files for *Brady* material.

### A.

Prior to trial, Kasi requested that the Commonwealth provide all *Brady* material of which it was aware. Because of the involvement of various federal agencies, Kasi also served subpoenas duces tecum and requests under the Freedom of Information Act ("FOIA") to the State Department, Immigration and Naturalization Service ("INS"), CIA,

and FBI. From the FBI in particular, Kasi sought the production of numerous documents, tapes, and optical disks related to the FBI's investigation of the murders and the ultimate capture of Kasi in Pakistan. *See generally*, *Kansi v. United States Dep't of Justice*, 11 F. Supp. 2d 42, 43 (D.D.C. 1998) (noting that the FBI had identified 14,281 pages of documents as responsive to Kasi's FOIA request). The stated purpose of Kasi's requests was to explore the circumstances surrounding his seizure in Pakistan and his return to this country for trial.

Although some documents were voluntarily produced to Kasi, and FBI Agent Garrett was available for questioning by the defense on several occasions, the FBI and CIA consistently refused to comply with the subpoenas duces tecum. Kasi was advised that he must instead pursue a request for information under the applicable federal regulations governing such requests for information. Although Kasi did pursue his requests directly with the federal agencies, he remained dissatisfied with the responses. He eventually sought and obtained an order from the state court directing the federal agencies to appear and explain their refusal to respond to the court's subpoenas. At the hearing, a representative for the federal agencies appeared and asserted that under the federal Housekeeping Statute, *see* 5 U.S.C.A. § 301 (West 1996), *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), and the doctrine of sovereign immunity, the state court lacked jurisdiction to compel a federal custodian of records to comply with a subpoena for documents obtained by the employee in the course of his official duties. The trial court agreed, refusing to issue an order of contempt, and ruling that it had no jurisdiction to hold a federal official in contempt for failing to respond to a state court's subpoena. Accordingly, the rule to show cause was dismissed and no further attempt to compel production was made.

On direct appeal to the Virginia Supreme Court, Kasi alleged that the trial court "erred in not holding the CIA in contempt for failure to respond to a valid subpoena," J.A. 518 (Assignment of Error #2), "erred when it denied on 22 September 1997 the motion to compel [exculpatory] discovery" under *Brady* from the Commonwealth and the United States, J.A. 524 (Assignment of Error 76), and "erred in denying defendant Kasi's motion to compel discovery when the material in the custody of agents of the Federal Government and the Com-

monwealth's Attorney did not even attempt to investigate what that evidence was since these Federal agents stated the information was classified and confidential," J.A. 523 (sic) (Assignment of Error 73). The Virginia Supreme Court summarily dismissed all three assignments of error on the merits. *See Kasi*, 508 S.E.2d at 60. In his state habeas petition, Kasi argued that the trial court had denied him "his right to compulsory process, effective assistance of counsel and due process of law in not enforcing its subpoenas duces tecum against the federal officials." J.A. 584. This claim, in turn, was summarily denied by the Virginia Supreme Court as procedurally defaulted.

B.

We begin with the Commonwealth's claim that we are precluded from reviewing Kasi's *Brady* claim because he procedurally defaulted the claim in the state court proceedings and because it was not raised before the district court.

Before a court may address a claim raised in a federal habeas petition, the petitioner must have first exhausted the claim in state court. *See* 28 U.S.C.A. §§ 2254(b), (c) (West 1994; Supp 2002). However, "the exhaustion requirement is satisfied so long as a claim has been 'fairly presented' to the state courts." *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000), *cert. denied*, 531 U.S. 1193 (2001) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). To do so, the petitioner must have presented to the state court "both the operative facts and the controlling legal principles." *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997) (internal quotation marks omitted).

As correctly noted by the magistrate judge, Kasi's Assignments of Error 2, 73, and 76 were raised on direct appeal to the Virginia Supreme Court and, while dismissed in a summary fashion, were nonetheless "fairly presented" and dismissed on the merits. The Virginia Supreme Court thereafter summarily dismissed the state habeas claim as procedurally barred under *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974) (holding that a defendant may not raise a claim on state habeas that was not presented at the trial and upon direct appeal from the conviction), as opposed to *Hawks v. Cox*, 175 S.E.2d 271, 274 (Va. 1970) (holding that a claim which had been decided against the defendant on direct appeal would likewise not be cogniza-

ble on state habeas). But, this does not bar federal habeas review of the claim. Because Kasi had "fairly presented" the claim before us to the state court on direct appeal, and it was adjudicated on the merits in that appeal, he was not required to obtain another merits determination on state habeas to preserve it for federal habeas review. *See Corcoran*, 220 F.3d at 288.

We also reject the government's claim that we are precluded from considering Kasi's *Brady* claim because the claim presented in the federal habeas petition only challenged the state court's refusal to enforce the subpoenas against the FBI, and not the Commonwealth attorney's failure to review the FBI files for *Brady* material. Specifically, the government argues that, because Kasi asserted that he "was improperly denied access to material evidence possibly favorable to his defense by the trial court's refusal to enforce subpoenas served on the FBI, CIA, and other agencies" in his federal habeas petition, J.A. 728, Kasi has abandoned his claim that his due process rights as defined by *Brady* were violated.

As acknowledged by the Commonwealth, however, the claim before us today is virtually identical to Kasi's Assignment of Error #73 at the state appellate level. Kasi may have focused his claim on the failure of the state court to compel the FBI to comply with the subpoena issued to it, but his underlying complaint has always been that his due process rights under *Brady* required the trial court to *either* enforce the subpoenas served upon the federal agencies *or* require the Commonwealth to review the information contained in the federal agencies' files for *Brady* information. Indeed, in addressing Kasi's claim on federal habeas review, the magistrate judge and district court both discussed Kasi's right to discovery and, in particular, his asserted right under *Brady* to have access to the federal files.

Accordingly, we are satisfied that the substance of Kasi's claim was sufficiently presented to the state court on direct appeal and to the district court in the federal habeas petition and, therefore, is properly before us for our review.

## C.

Thus, we turn to the merits of Kasi's claim that his constitutional right to obtain exculpatory evidence was violated by the trial court's refusal to enforce the subpoena issued to the FBI and the Commonwealth attorney's failure to undertake review of the file for *Brady* material.[5] Because the Supreme Court of Virginia summarily dismissed Kasi's *Brady* claim on direct appeal, we must conduct an independent review of the record and applicable law to determine whether the result reached by the state court contravenes or unreasonably applies clearly established federal law, as determined by the United States Supreme Court. *See Bell v. Jarvis*, 236 F.3d 149, 163 (4th Cir. 2000) (*en banc*), *cert. denied*, 122 S. Ct. 74 (2001).

## 1.

We begin with the Virginia Supreme Court's rejection of Kasi's claim that the state trial court erred in concluding that it lacked jurisdiction to compel the FBI to comply with the subpoena.

Under the federal Housekeeping Statute, "[t]he head of an Executive department . . . may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." 5 U.S.C.A. § 301. Pursuant to this authority, the United States Department of Justice has promulgated a regulation prohibiting employees and former employees of the Department from producing any material contained in the files of the Department without prior approval from the proper official within the Department. *See* 28 C.F.R. § 16.22(a) (2001). As noted by the Supreme Court, "[w]hen one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas duces tecum will be willingly obeyed or challenged is obvious."

---

[5]As previously noted, the record indicates that the agencies did voluntarily produce some documents to Kasi during the state court proceedings. In this appeal, Kasi has only pursued a *Brady* claim based upon the FBI file materials.

*Touhy*, 340 U.S. at 468. Thus, the Court held, the Attorney General may "prescribe regulations not inconsistent with law for 'the custody, use, and preservation of the records, papers and property appertaining to' the Department of Justice." *Id.* And, Justice Department employees may not be compelled by states to act contrary to their superiors' orders not to produce such documents. *See id.* at 467.

Although we only review the Commonwealth's decision to determine if it is contrary to or an unreasonable application of federal law as determined by the Supreme Court, we note that this circuit has been called upon to apply *Touhy* in cases similar to the one before us. These cases are instructive in our habeas review. *See Bell*, 236 F.3d at 174 n.17; *Vick v. Williams*, 233 F.3d 213, 222 (4th Cir. 2000).

First, in *Smith v. Cromer*, 159 F.3d 875 (4th Cir. 1998), we rejected a state criminal defendant's attempt to subpoena two Assistant United States Attorneys and a DEA agent to testify in his drug offense trial and to compel production of their files concerning his activities as a confidential informant. After the government removed the case from the Maryland state court to the federal district court pursuant to 28 U.S.C.A. § 1442(a)(1), the district court granted the government's motion for protective order and to quash the subpoenas. We affirmed. Noting the well-settled rule from *Touhy*, we held that, under the governmental privilege of sovereign immunity, the state court lacked jurisdiction to enforce the subpoenas. *See Smith*, 159 F.3d at 881.[6] And, we noted, any attempt by a state court "to assert the power of judicial review over decisions made by federal agencies while implementing their own regulations [would be] contrary to the Administrative Procedures Act, 5 U.S.C.A. § 702, which expressly limits such review authority to the federal courts." *Id.* at 879.

Next, in *United States v. Williams*, 170 F.3d 431 (4th Cir. 1999), we were presented with a state court subpoena issued on behalf of the defendant in a state murder prosecution to the FBI seeking production of all files pertaining to its assistance in the state homicide investiga-

---

[6]Because a federal court's jurisdiction upon removal under § 1442(a)(1) is derivative of the state court's jurisdiction, we also held that the doctrine of sovereign immunity divested the federal court of jurisdiction to enforce the subpoenas. *See Smith*, 159 F.3d at 879.

tion. Like Kasi, the defendant in *Williams* claimed that the files contained exculpatory evidence to which he was entitled. When the FBI refused to comply, the state court issued a show cause order, again prompting the government to remove the matter to federal court and obtain an order quashing the state court subpoena and show cause order. We affirmed, reiterating that a state court lacks "jurisdiction to compel the FBI to produce documents subpoenaed by a defendant in the course of a state criminal prosecution." *Id.* at 433.

In this case, the Virginia Supreme Court rejected Kasi's claim that his rights under *Brady* were violated by the trial court's refusal to enforce subpoenas issued to the FBI, which had also participated in the investigation of the CIA murders with which he was charged and in his ultimate apprehension in Pakistan. Having independently reviewed the facts and the legal precedents that guide us, we cannot say that the Virginia Supreme Court's decision in this regard was contrary to or an unreasonable application of federal law, as determined by the Supreme Court.

2.

Thus, we turn to Kasi's claim that the Virginia Supreme Court's rejection of his *Brady* claim was contrary to or an unreasonable application of Supreme Court precedent because, under such precedent, the Commonwealth had a duty to review the FBI files for *Brady* material notwithstanding the sovereign immunity bar to the state trial court's enforcement authority.

In *Brady*, the Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted).

*Brady*, however, created no general constitutional right to discovery in a criminal case. *See Richie*, 480 U.S. 59-60. "The mere possi-

bility that an item of undisclosed information might have helped the defense . . . does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-110 (1976). Nor does the *Brady* right to obtain exculpatory evidence equate to a right to rummage through governmental files. *See Richie*, 480 U.S. at 59.

> In the typical case where a defendant makes only a general request for exculpatory material under *Brady v. Maryland*, it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.

*Id.* (internal citation and footnote omitted); *see also United States v. Larouche*, 896 F.2d 815, 826 (4th Cir. 1990) (noting that "[c]riminal defendants do not have a 'general' constitutional right to discovery. . . . [A]n item that the government is required to provide must not only be exculpatory but also 'material in the sense that its suppression undermines confidence in the outcome of the trial.'" (citation omitted)).

This case, of course, differs from the ordinary one. Kasi does not allege that the Commonwealth has failed to conduct a review of its own files, or the files of state agencies, and produce exculpatory evidence to which *Brady* would entitle him. And, Kasi concedes that he cannot point to a specific identifiable piece of evidence that may have been favorable or in any way material to his guilt or innocence, whether contained within state files or federal files. For this reason, the magistrate judge recommended rejecting Kasi's *Brady* claim, noting that Kasi was attempting to "leap frog over the basic hurdle he has by asserting his right to recover evidence in the government's [possession] . . . without ever giving a clue of what the evidence favorable to the accused and material to guilt or punishment might be." J.A. 663. The district court agreed, noting that "[i]n his state habeas petition, [Kasi] did not provide a single suggestion of a single fact present in the government's files which would go to the issue of his guilt or innocence, or the punishment imposed upon him." *Kasi*, 200 F. Supp. 2d at 599. As noted by the magistrate judge and district court, Kasi

failed to establish a basis for his claim that the federal agency files contained material evidence.

3.

Although we agree that Kasi has failed to make the requisite showing to establish an ordinary *Brady* claim, the district court's conclusion in this regard does not completely address Kasi's argument on appeal. Kasi asserts that he need not make the normal showing that exculpatory evidence exists which was not brought forward. Rather, he asserts that was denied due process because, under *Kyles v. Whitley*, 514 U.S. 419 (1995), the Commonwealth was required to conduct a *Brady* review of the FBI's files in order to locate and produce any exculpatory evidence that *might* exist within them.

In *Kyles*, the Supreme Court held that, because materiality for *Brady* purposes is measured in terms of the cumulative effect of suppressed evidence, the prosecutor is "assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." *Kyles*, 514 U.S. at 437. This, the Court held, "means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.*

Succinctly stated, Kasi claims that, under *Kyles*, the Commonwealth was required to conduct a *Brady* review of all of the files of all of the agencies who assisted in the investigation, arrest, and prosecution of Kasi for the CIA murders, regardless of whether they were state or federal agencies. And, Kasi asserts, he need not point to any exculpatory evidence which was withheld to establish a violation of his *Brady* rights, as he would otherwise be required to do, so long as he establishes that no review was undertaken by the prosecutor. This absolute duty to review federal agency files must be imposed upon the Commonwealth, Kasi argues, because state criminal defendants will otherwise be left with no mechanism for obtaining exculpatory evidence to which they would otherwise be entitled under *Brady*.

Although Kasi's *Brady* claim is an interesting one, we find it to be procedurally and analytically flawed. As an initial premise, we reject

Kasi's claim that *Kyles* imposes a duty upon a state prosecutor to conduct a *Brady* review of federal agency files. The FBI files requested by Kasi are in the possession of federal authorities, over whom the Commonwealth has no authority. *See Williams*, 170 F.3d at 434 & n.3; *Smith*, 159 F.3d at 882-83. Thus, the state prosecutor has no more authority to demand that the FBI allow him access to its files so that he can conduct a *Brady* review than the state court has to compel the FBI to allow the state criminal defendant such access.

Kasi's claim that there must be some exception to the *Touhy* bar in cases such as his because there is no mechanism by which he can assert his constitutional right to disclosure of the documents is also without merit. In *Williams*, the state criminal defendant also argued that we should "carve out an exception to the doctrine of sovereign immunity" discussed in *Smith*, "and rule that he need not have complied with the Justice Department's regulations, because the FBI was assisting state authorities in their investigation of the state crimes for which he was ultimately indicted." *Williams*, 170 F.3d at 434. Requiring compliance with agency regulations in such circumstances, the defendant argued, "would be tantamount to sanctioning a federal agency's decision to withhold potentially exculpatory evidence from a state criminal defendant." *Id.*

We rejected the claim, holding that a state criminal defendant who seeks investigative file materials from a federal agency must do so under the applicable agency regulations and that "[t]he proper method for judicial review of the agency's final decision pursuant to its regulations is through the Administrative Procedure Act ('APA')." *Id.*; *see also* 5 U.S.C.A. §§ 701-706 (West 1996). If "aggrieved by the response of a federal law enforcement agency made under its regulations," the state criminal defendant is not without a remedy. *Williams*, 170 F.3d at 434. He "may assert his constitutional claim to the investigative information before the district court, which possesses authority under the APA to compel the law enforcement agency to produce the requested information in appropriate cases." *Id.*[7]

---

[7]As we noted in *Williams*,

[o]n review, district courts have jurisdiction to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or

Accordingly, the Administrative Procedure Act provides an appropriate procedure for judicial review of a decision by a federal agency to withhold investigation materials from a state criminal defendant, in which the state criminal defendant can proffer any perceived rights to the file materials under the constitutional principles set forth in *Brady* and its progeny. Indeed, Kasi availed himself of such a procedure. After he was convicted, he sued under the Freedom of Information Act to compel production by the Department of Justice and the FBI of documents pertaining to him. In response, the FBI released portions of its files, but withheld others under a FOIA exception for "investigatory files compiled for law enforcement purposes whose release 'could reasonably be expected to interfere with enforcement proceedings.'" *Kansi*, 11 F. Supp. 2d at 43-44 (quoting 5 U.S.C.A. 552(b)(7)(A) (West 1996)). Kasi thereafter demanded the remainder of the documents, asserting in part that the information sought might be exculpatory under *Brady*. The district court rejected the demand and dismissed the case. Apparently, Kasi did not choose to pursue an appeal of that ruling to the District of Columbia Court of Appeals.

In this case, we are presented with the much narrower issue of whether the Virginia Supreme Court's rejection of Kasi's *Brady* claim was contrary to or an unreasonable application of the principles set forth by the Supreme Court in *Brady* and *Kyles*. It clearly was not and, therefore, Kasi is not entitled to habeas relief on this basis.

IV.

Kasi's final contention is that he was deprived of a fair trial, as guaranteed by the Due Process Clause of the Fourteenth Amendment, because the state trial court refused his request to conduct individual voir dire of the jurors to determine if they had acquired knowledge

---

otherwise not in accordance with law," including action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C.A. § 706(2)(A)-(B). In addition, the APA vests the district court with authority to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.A. § 706(1).

*Id.* at 434.

of the murder of four Americans that had occurred in Karachi, Pakistan, while the trial was in progress.

A.

No one disputes the high profile nature of this case. Indeed, the record reveals that some heightened security measures were taken to protect the jurors from the outset, including maintaining the confidentiality of their identities and, while not sequestering them, bringing them to the courthouse in a group from an off-site meeting location. After the jury rendered its verdicts in the guilt phase, the members submitted a note to the trial court inquiring as to whether they should be aware of any activities or information regarding their personal safety and whether there were any precautions or security measures available to them through the Commonwealth. In sum, the jurors requested "a security briefing as to possible risks [they] may encounter." J.A. 446. Kasi's counsel requested individual voir dire of the jurors to determine if there had been any discussion or speculation of danger and moved, in the alternative, for a mistrial. The trial court denied both motions. Instead, the court brought the jurors in collectively, assured them that the security measures that had been taken were the same measures taken in any potential capital and high-publicity case, assured them that the court was aware of no particular danger to them in this case, and invited them to individually express any particular concerns through another note. No further concerns were expressed by the jurors, and the court later commented that he had observed no further signs of concern.

Two days later, four Americans were murdered in Karachi, Pakistan. News media raised the possibility that the killings were related to the conviction of Kasi as retaliation by his sympathizers. Kasi's counsel brought the news reports to the court's attention the following morning and requested individual voir dire of the jurors to determine if any had knowledge of the event. The trial court denied this motion, as well as a follow-up motion for a mistrial, noting that defense counsel's fear that members of the jury would not be honest in a group setting was speculative. Instead, the court ruled that it would be best to conduct a slightly heightened questioning of the members of the jury as a group. Thus, the trial court brought the jury in and conducted his usual inquiry as to whether anyone had been exposed to any media

accounts about the trial, and then added a comment that the court was "particularly concerned about . . . news articles that were on the front page of various newspapers and on TV and on the radio related by the press to this case." J.A. 467. There was no response to either inquiry, and trial resumed.

Later that same day, the trial court noted that the press coverage and requests for press credentials had escalated since the Karachi murders, and the court expressed concern that the coverage had shifted from the reporting of facts and events of the trial to "opinion and speculation." J.A. 471. In view of this "crazy" reporting, J.A. 472, and to avoid having to deal with a defense motion for a mistrial each day based upon the escalated and sensationalized coverage, the trial court ruled that it would be best to sequester the jury for the balance of the sentencing phase and for their deliberations. Kasi's counsel, asserting that the sequestration would send "a terrible signal that they are in danger," J.A. 479, again moved for a mistrial, which was denied. The trial court then brought the jurors in and advised them that they should make preparations for sequestration, taking care to inform the jurors that the sequestration had become necessary because the trial was in the finishing stages and that he felt they needed to be protected from press coverage, which had become very opinionated.

Shortly after being informed that the jury would be sequestered, a single juror wrote a private note advising the trial court that she had heard the beginnings of a report about Americans being shot and killed in Pakistan before she could turn off her clock-radio that morning. In the note, the juror stated that she did not bring up the matter earlier because she was not sure if the report was related to the case, but that the sequestration decision had caused her to consider the possibility that it might be related. After consulting with counsel, the court and counsel conducted individual voir dire of this juror. The juror repeatedly stated that she did not know at the time she heard the report, and still did not know, whether the Pakistani incident was related to the trial. She further testified that she had not discussed the matter with any of the other jurors and that, in any event, the portion of the report she had heard would have no effect upon her ability to be fair and impartial and to decide the case based solely upon the law and the evidence. Defense counsel's request to conduct individual voir dire of the remaining members of the jury regarding their knowl-

edge of the incident was again denied, as were the subsequent motions for mistrial.

On direct appeal, the Virginia Supreme Court summarily held that "[t]he court's refusal to grant [Kasi's] repeated motions for a mistrial during this series of trial events was an exercise of the court's sound discretion, and we find no abuse of that discretion." *Kasi*, 508 S.E.2d at 67. Therefore, we must conduct an independent review of the record and applicable law to determine whether the result reached by the state court was "contrary to," or "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1); *see Bell*, 236 F.3d at 163.

### B.

As an initial matter, we address the Commonwealth's assertion that Kasi procedurally defaulted this claim by arguing summarily and under Virginia caselaw that the trial court abused its discretion by not allowing individual voir dire regarding the Karachi killings on direct appeal, and by not raising the issue at all on state habeas review. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam) (reversing grant of writ of habeas corpus where petitioner, on direct appeal in state court, claimed that evidentiary ruling violated state law but did not claim violation of any federal constitutional right). The trial transcript reveals that Kasi's counsel clearly objected to the trial court's refusal to conduct individual voir dire as a violation of his right to a fair and impartial jury under *both* the United States Constitution and the Virginia Constitution, and it appears that he pursued his claim on direct appeal to the Virginia Supreme Court. Thus, we are satisfied that the federal constitutional claim presented in Kasi's federal habeas petition was "'fairly presented' to the state court[]" for decision and is properly considered here. *Corcoran*, 220 F.3d at 288. Although the Supreme Court of Virginia summarily dismissed Kasi's assignments of error and did not discuss the federal constitutional issue in doing so, "it is the petitioner's argument to the court rather than the court's decision that is dispositive." *Weeks v. Angelone*, 176 F.3d 249, 262 (4th Cir. 1999).

## C.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a state criminal defendant the right to be tried "by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted). Voir dire examination is a principal means of enabling the court to ensure that an impartial jury decides the case. *See Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991) ("Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges"); *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion) ("Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored").

It is well established, however, that a trial court has "broad discretion in conducting the voir dire of the jury, and particularly in phrasing the questions to be asked." *United States v. Jones*, 608 F.2d 1004, 1007 (4th Cir. 1979); *see*, *e.g.*, *Mu'Min*, 500 U.S. at 424 (noting that "the trial court retains great latitude in deciding which questions should be asked on voir dire"); *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) ("Voir dire is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." (internal quotation marks omitted)). And, "[p]art and parcel of [this] deference to the trial court's conduct of voir dire is a reluctance to second-guess the court's decision to refuse inquiry into certain matters." *United States v. Lancaster*, 96 F.3d 734, 739 (4th Cir. 1996). A defendant does not always have the right "to have questions posed during voir dire specifically directed to matters that conceivably might prejudice veniremen against him." *Ristaino*, 424 U.S. at 595. Rather, "the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant." *Id.* at 595 (footnote omitted). Thus, we have held that, "[i]n the context of cases . . . in which the proposed voir dire question does not address issues of racial or ethnic prejudice," the trial court "need not pursue a specific line of questioning on voir dire, provided the voir dire as a whole is reasonably sufficient to uncover bias or partiality in the venire." *Lancaster*, 96 F.3d at 739-40.

In this case, the trial court conducted its usual voir dire of the jury on the morning after the news stories emerged concerning the Karachi murders, inquiring as to whether any member of the jury had "received any information from the media, friends, family, anywhere, in any way related to th[e] case." J.A. 467. Receiving no response, the court then went further to inform the jury that the court was "particularly concerned about . . . news articles that were on the front page of various newspapers and on TV and on the radio related by the press to th[e] case" and advised the jury that it "want[ed] to be sure that nobody has anything that you need to bring to our attention about anything that you have heard." J.A. 467. Prompted by the court's sequestration of the jury due to increased press coverage, a single juror later came forward out of concern that she may have heard a related media account that morning. This juror, however, remained uncertain of whether the account was related and, in any event, the trial court carefully questioned the juror on an individual basis regarding any possible impartiality, receiving multiple assurances that what she heard would have no effect upon her ability to render a verdict based solely upon the facts and evidence presented during the trial. Kasi has pointed to nothing that would indicate that any of the other jurors had heard about the Karachi killings, nor is there any indication that any member of the group would not or did not truthfully respond to the trial court's questions to the group.

Finding that the trial court's questions were sufficient to ensure the absence of any bias or prejudice on the part of the jury, the trial court denied Kasi's motions for individual voir dire and, in the alternative, for mistrial, and the Virginia Supreme Court found that the trial court did not abuse its discretion in this regard. We agree. Having reviewed the voir dire conducted by the trial court, we too are satisfied that it was sufficient to assure that Kasi was tried by a fair and impartial jury. Because the Virginia Supreme Court's decision that the trial court did not abuse its discretion in refusing to allow individual voir dire was not contrary to or an unreasonable application of federal law, as determined by the United States Supreme Court, we reject the claim for habeas relief on this basis as well.

V.

For the foregoing reasons, we conclude that the district court correctly denied Kasi's petition for habeas relief. Accordingly, we deny Kasi's request for a certificate of appealability and dismiss the appeal.

*CERTIFICATE OF APPEALABILITY*

*DENIED AND APPEAL DISMISSED*